### Jackson, Receiver, v. Foote.

*(Circuit Court, N. D. Illinois. April 17, 1882.)*

**1. Contract of Sale—Future Delivery—Option Deals.**

Where a firm of brokers and commission merchants, dealing in grain and provisions on the board of trade in Chicago, transacted business for its customers, some of whom were buyers and some sellers, under the rules and regulations of the board, intending to deal in time contracts and to settle the differences, so as to avoid paying for and carrying the commodities bought, *held*, not a dealing in "options to buy or sell at a future time," and is not within the prohibition of the statute of Illinois. St. Ill. c. 38, § 130.

**2. Same—Contracts Valid and Binding.**

Where the indebtedness which accrued from the defendant to the firm of brokers was for commissions earned by the firm in making trades for the defendant, duly authorized by him, and for moneys actually paid by the firm in the settlement of differences in such trades, and that none of these differences were paid upon "options to buy or sell grain or other commodities at a further day," but upon sales or purchases of grain or other commodities, where the seller had only an option as to the time of delivery, such contracts are not within the Illinois statute, and are valid and binding upon the parties.

**3. Same—Guaranty on Notes—Bona Fide Holder.**

Where, under such a contract, defendant became indebted to the firm for balances, and on final settlement gave to the firm the notes sued on, the payment of which he guarantied, and the notes were given to the bank, with defendant's guaranty written thereon, in payment of a debt due the bank by the firm, even though the demand of the firm was tainted as a gambling claim at common law, defendant cannot be heard to set up the illegality of the dealings between himself and the firm as a defence to these guaranties in the hands of a *bona fide* holder.

**4. Guaranty—Bona Fide Holder.**

A guaranty in the hands of a *bona fide* holder is valid, and not affected by any of the equities between the original parties.

*Dent & Black* and *Lyman & Jackson*, for plaintiff.

*L. H. Bisbee* and *Albion Cate*, for defendant.

Blodgett, D. J. This is a suit on a guaranty of payment by defendant of two promissory notes, of $5,000 each, made by the trustees

of the estate of Ira Couch, both dated July 1, 1876, and made payable to defendant,—one on July 1 and the other on October 1, 1877, with interest at the rate of 8 per cent. per annum.

The plaintiff is receiver of the Third National Bank of this city, and the notes in question were delivered to the bank with the guaranty of defendant written thereon, about December 30, 1876, with other notes, as collateral security for the payment of a note of S. G. Hooker & Co. to the bank for the sum of $13,900, due from that firm to the bank for money loaned on the note of Hooker & Co.; being dated December 30, 1876, payable to the bank in 90 days after date, with interest at 10 per cent. per annum.

The defence insisted on at the trial is that the two notes in question were transferred by the defendant to the firm of S. G. Hooker & Co. in settlement of a claim or indebtedness due from the defendant to said firm for certain gambling dealings, conducted by the firm for the defendant, on the Chicago board of trade.

The facts, as developed by the proof, appear to be that in the fall of 1874, and for about two years thereafter, the firm of S. G. Hooker & Co. were brokers and commission merchants, dealing in grain and provisions on the board of trade in this city, were members of the board, and transacted business for their customers under its rules and regulations; that Foote had some dealings on the board through another broker, in which his broker had taken and paid for a large quantity of oats which had been bought on an order of the defendant, but the expenses of storing, interest, etc., had been so large that the defendant had become dissatisfied, and some difficulty occurred in effecting a settlement with his broker. Mr. Hooker, of the firm of S. G. Hooker & Co., was applied to and counselled with by the defendant in securing this settlement, and Hooker, being an old friend of the defendant, advised him that if he wished to speculate or deal any more on the board of trade he had better do it with his, Hooker's, firm. The defendant assented to this, provided he could only trade or deal in differences; that is, Hooker's firm was not to take in or carry any commodities bought, but defendant was only to pay or receive the differences between the selling and buying or buying and selling prices of the commodities dealt in.

In pursuance of this arrangement the defendant from time to time gave orders to Hooker & Co. to buy or sell commodities on the board for his account, and they executed these orders by buying or selling as directed on the board in the usual form of such transactions where the seller had the option to deliver within a certain time,—as for

illustration, during the whole of the next month, or during the first half or last half of the next month, or of the month in which the transaction took place,—the only option in the transaction being as to the time within which the seller was allowed to make delivery. These dealings continued until some time in May or June, 1876, Hooker & Co. buying or selling grain, pork, or lard as directed by the defendant, and settling the differences; paying the money when the market was against the defendant, and receiving it for him when the market was in his favor; charging to him whatever sums were paid in settling differences when they were against him, and giving him credit when they received differences in his favor. In two or three transactions the firm seems to have taken in and paid for grain and provisions bought for defendant and held them for a short time, and then sold them, charging the defendant with the interest, storage, etc., incident to such transactions. The defendant was also debited on the books of the firm with commissions for transacting the business, and with divers sums of money paid him from time to time, so that, at the time the dealings of the firm for the defendant closed, he stood debited to them on their books in the sum of about $22,000. In payment of this indebtedness the defendant transferred and delivered to Hooker & Co. four notes of $5,000 each held by him against the Couch estate, the payment of which notes he guarantied and two of which are the notes in question, and the firm of Hooker & Co. transferred the two notes now before the court, with the defendant's guaranty of payment thereon, to the Third National Bank of Chicago, to secure their own indebtedness to the bank for money borrowed.

The testimony in the case fully satisfies me that Mr. Hooker, when he assumed for his firm to act as the defendant broker in his dealings on the board of trade, did not contemplate or intend to make any different transactions for the defendant than for his other customers. He undoubtedly intended to make purchases or sales where the buyer had an option as to the time within which to make delivery, and he intended to so conduct the defendant's transactions as to avoid taking and paying for any article bought, and he seems to have explained to the defendant how, by reason of his many customers, some of whom were sellers and others buyers on the market, he could so manage the defendant's deals that he need not take any commodity bought, but could settle simply the difference between the purchase price and the market price, when the seller had the right of delivery. Hooker did not, I am satisfied from the proof, intend to

deal in "options to buy or sell at a future time," such as are prohibited by the Illinois statutes, (Rev. St. Ill. c. 38, § 130,) but intended, as I have said, to deal in time contracts, and to settle the differences so as to avoid paying for and carrying the commodities bought. I am also satisfied that, while the defendant may have known but little when he commenced with this firm as to the mode in which the business was to be transacted by them for him, yet he did not contemplate dealing in "puts and calls," or "options to buy and sell at a future time," and that he was very soon aware of the forms and modes in which the business was done for him by the firm. He intended without doubt that his brokers should so manage his trades that differences should be paid or collected, instead of his taking or holding the article dealt in, or having his broker do it for him and at his expense. He may have contemplated dealing wholly in differences to such an extent as to make the transactions such as have been construed by the courts of this state to be wager contracts or gambling contracts at common law; but he did not, I am satisfied, intend that his brokers should make for him such contracts as are expressly made illegal by the Illinois statutes, but, at most, they were to be transactions where it was not intended that any commodity should be actually received or delivered, but that he was to deal in differences only, coming perhaps within the rule laid down by the supreme court of this state in *Lyon* v. *Culbertson*, 83 Ill. 33, where the court said:

"The fact that no wheat was offered and demanded shows that neither party expected the delivery of any wheat, but in case of default in keeping margins good, or even as to the time of delivery, they only expected to settle the contract on the basis of differences, without even performing or offering to perform his part of the agreement, and if this was the agreement it was only gambling on the price of wheat. If such gambling transactions shall be permitted, it must eventually lead to what are called 'corners,' which engulf hundreds in utter ruin, derange and unsettle prices, and operate injuriously on the fair and legitimate trader in grain as well as the producer, and are pernicious and highly demoralizing to the trade. A contract to be thus settled is no more than a bet on the price of grain during or at the end of a limited period. If the one party is not to deliver or the other to receive the grain, it is in all but name a gambling on the price of the commodity, and the change of names never changes the quality or nature of things."

In other words, as I understand the court in this case, where there is an intention to deal only in differences, the transaction is held to be a wager contract at common law.

It is also equally evident from the proof that the indebtedness which accrued from the defendant to S. G. Hooker & Co. was for commissions earned by the firm in making trades for the defendant, duly authorized by him, and for moneys actually paid by the firm in the settlement of differences in such trades, and that none of these differences were paid upon "options to buy or sell grain or other commodities at a future day," but upon sales or purchases of grain or other commodities where the seller had only an option as to the time of delivery,—contracts which have been held not to be within the Illinois statutes, and to be valid and binding upon the parties. *Pixley* v. *Boynton*, 79 Ill. 351; *Wolcott* v. *Heath*, 78 Ill. 433; *Cole* v. *Milmine*, 88 Ill. 349; *Porter* v. *Viets*, 1 Biss. 177; *Clarke* v. *Foss*, 7 Biss. 540; 14 Bush, (Ky.) 727; *Gelbert* v. *Gaugar*, 10 Leg. N. 340.

Assuming, then, that the defendant, by his agreement with Hooker & Co., intended to deal only in differences, and that the bulk of the debit against him on the books of the firm accrued for differences paid by the firm on trades made for him in pursuance of this agreement, the only question is, do these facts so taint this paper as to make this guaranty of payment void in the hands of this bank? There is no dispute but what the bank is a *bona fide* holder of these notes, with defendant's guaranty thereon, taken for value before due and without notice of any defence. The statute of Illinois makes notes and other securities given in payment of gambling contracts to "sell or buy grain or other commodities at a future time" void in the hands of any assignee or holder; but the transactions out of which this indebtedness between Hooker & Co. and the defendant arose were not "options to buy or sell at a future time," but were contracts of sale, in which the seller was bound to deliver at a future time within certain limits. They were not, therefore, gambling contracts within the Illinois statutes. They may have been, as I have already said, gambling or wager contracts at common law, to such an extent as that if Hooker & Co. had sued the defendant he could have successfully defended; but the common law will not help either party to a gambling contract; it simply leaves them where it finds them. If one, having lost money by gambling or on a wager, pays it, the law will not aid him to recover it back from the owner. 2 Smith, Lead. Cas. 307; *Gregory* v. *King*, 58 Ill. 169.

It seems to me to follow, then, as a necessary conclusion, that the defendant having delivered these notes with his guaranty upon them to Hooker & Co. in settlement of their demand against him, even though their demand was tainted as a gambling claim at common

law, he cannot be allowed to set up the illegality of the dealings between himself and Hooker & Co. as a defence to these guaranties in the hands of a *bona fide* holder. He has put this paper, with his guaranty affixed to it, afloat upon the market. Unless a clear case of violation of the statute is made out, and the burden of making such a case is upon the defendant, this guaranty in the hands of a *bona fide* holder is valid, and not tainted by any of the defences between the original parties. I may say further that it seems from the defendant's own testimony and from the accounts rendered—a transcript of S. G. Hooker & Co.'s books—that the settlement in question and upon which these notes and guaranties were given, was for an account into which cash paid, commissions, and other elements entered which were not of a gambling nature; and it is extremely doubtful in my mind, even if suit had been brought by S. G. Hooker & Co. against the defendant, he could, upon the showing now made upon this trial, have successfully defended against their claim.

The issues are found for the plaintiff.

See *Melchert* v. *Am. U. Tel. Co.* 11 FED. REP. 201, note.