## WARD v. VOSBURGH.

*(Circuit Court, E. D. Wisconsin.  May, 1887.)*

1. CONFLICT OF LAWS—CONTRACTS—GAMING.

The rule laid down in *Barnard* v. *Backhaus*, 52 Wis. 593, 6 N. W. Rep. 252, and 9 N. W. Rep. 595, that, "to uphold a contract for a sale and delivery of grain at a future date for a price certain, it must affirmatively and satisfactorily appear that the contract was made with an actual view to the delivery and receipt of grain, and not as an evasion of the Wisconsin statute against gaming, or a cover for a gambling transaction," does not apply to an action in the federal courts in that state by a broker, resident in Illinois, to recover advances and commissions growing out of orders given him by a citizen of Wisconsin, to be executed on the floor of the Chicago Board of Trade.  The rights of the parties to such a suit are governed by the laws of Illinois.

2. CONTRACTS—GAMING—OPTIONS—INTENT—BURDEN OF PROOF—LIABILITY FOR COMMISSIONS AND ADVANCES.

Under the Illinois statutes, a simple option, reserved by the seller to himself, as to time of delivery of property within certain limits, and the settlement of differences upon such a contract, does not render the contract void as a gambling transaction.  The burden of proof, in an action on such a contract by a broker for commissions and advances for settlements made by the "ringing up" process, is therefore upon the defendant to show the gambling intent; and it does not follow, from the fact that he himself intended no delivery, that such was the intention of the broker and of the other principal, or that deliveries were not made as a matter of fact.

3. CUSTOM AND USAGE—"RINGING UP"—GAMING.

The custom of "ringing up," in vogue among brokers and commission merchants, is founded in commercial convenience, and when not adopted to promote a gambling transaction, is not in contravention of the law.

4. SAME—EFFECT OF—ESTOPPEL.

A speculator who is familiar with the methods and usages of the Chicago Board of Trade is presumed, upon giving orders to his broker, a member of that body, to contract with reference thereto; and he will not be heard to set up, as a defense to a suit by the broker for commissions and advances, that the custom prevailing there, in obedience to which the advances were made, enlarged his liability under the contract.

At Law.

*Joseph Wright* and *Shepard & Shepard*, for plaintiff.

*Quarles & Spence*, for defendant.

DYER, J.  This is undoubtedly a hard case for the defendant, and, if the court could see its way clear to relieve him from the liability which is sought to be enforced against him, it would be glad to do so. So many decisions have been rendered by various courts upon the particular question we have here to decide, in which may be found the expression of conflicting views, that it is not easy to arrive at a conclusion unattended with doubts.  One proposition is well settled, namely, that

where in fact no purchase or sale of property is intended, but simply a wager on the rise or fall of prices, the transaction is a gambling one, and cannot be upheld. It is also equally true and well settled by authorities, so familiar that they need not here be cited, that where the gambling intent exists only on one side, and the other party intends an actual purchase or sale, then the transaction is valid. The difficulty always is in applying these principles of law to the facts as they are developed in the given case. It has been of late repeatedly decided, that, if the parties intend in fact to buy or sell property to be delivered at a future time agreed upon by them, it is not a gambling transaction, although they exercise the option of settling the difference in price, rather than make delivery of the property.

Upon a careful perusal of the opinion of the court in *Barnard* v. *Backhaus*, 52 Wis. 593, 6 N. W. Rep. 252, and 9 N. W. Rep. 595, and of the record and testimony in that case submitted by counsel for the defendant, I am strongly inclined to the opinion that if the case in judgment involved a Wisconsin transaction, arising under the Wisconsin statute, that opinion might be considered a controlling authority in favor of the defendant here. The rule laid down in that case was that, to uphold a contract for a sale and delivery of grain at a future date, for a price certain, it must affirmatively and satisfactorily appear that the contract was made with an actual view to the delivery and receipt of grain, not as an evasion of the statute against gaming, or as a cover for a gambling transaction. The meaning of this proposition would seem to be that the burden of proof to uphold such contract is upon the party who seeks to recover upon it.

It was held by Judge GRESHAM, then district, now circuit judge in this circuit, in *Williar* v. *Irwin*, 11 Biss. 60, that "the burden of showing that the parties were carrying on a wagering business, and were not engaged in legitimate trade or speculation, rests upon the defendant. On their face, these transactions are legal, and the law does not, in the absence of proof, presume that parties are gambling. A person may make a contract for the sale of personal property for future delivery which he has not got. Merchants and traders often do this. A contract for the sale of personal property which the vendor does not own or possess, but expects to obtain by purchase or otherwise, is binding, if an actual transfer of property is contemplated. A transaction which on its face is legitimate cannot be held void, as a wagering contract, by showing that one party only so understood and meant it to be. The proof must go further, and show that this understanding was mutual; that both parties so understood the transaction. If, however, at the time of entering into a contract for the sale of personal property for future delivery, it be contemplated by both parties that, at the time fixed for delivery, the purchaser shall merely receive or pay the difference between the contract and the market price, the transaction is a wager, and nothing more."

Other cases might be cited in which the same rule is applied to these contracts for the sale and purchase of grain on the board of trade as is

applied to every other contract, namely, that presumptively they are
legal and valid; and that the burden is not, in the first instance, upon
the plaintiff to show that the contract was not an evasion of the statute,
or a cover for a gambling transaction. The supreme court of the United
States in *Irwin* v. *Williar*, 110 U. S. 507, 508, 4 Sup. Ct. Rep. 160, ex-
pressly approve the statement of the law on this point, as it has just
been quoted from the opinion of Judge GRESHAM; and I must therefore
hold that the burden here is not upon the plaintiff to make it satisfac-
torily and affirmatively appear that the contracts in question were legal,
but that it is incumbent upon the defendant to show that the contracts
were in fact gambling transactions; and this is not shown by merely
proving his own intention in the transaction. As was well said in *Clarke*
v. *Foss*, 7 Biss. 548:

"It is very easy for either party to swear to what his own understanding of
the contract was, but that, standing alone, is manifestly immaterial. The
secret intentions of one party, contrary to what appears on the face of the con-
tract, and not communicated to the other party, cannot prevail to make a con-
tract illegal which is otherwise valid. The real question is, what was the
contract? and that implies an inquiry as to the mutual understanding and
meeting of the minds of the parties. What was that? It is easy for a party
to swear what his own understanding and intentions were; but, when he
comes to swear to the intentions and understanding of the other party, the
consideration due to his testimony stands on an entirely different footing. He
may be presumed to know his own intentions, but the evidence of the inten-
tions of the other party should not be of a merely subjective character, but
should consist of tangible facts and circumstances, outside of his own conscious-
ness, and a knowledge of which would be capable of satisfying other minds."

In *Bangs* v. *Hornick*, 30 Fed. Rep. 97, Judge BREWER in his opinion
says:

"Counsel for defendant say that it is the absolute duty of the court to
denounce this transaction, unless it clearly appears that it was a valid and
honest one. I think the duty of the court is precisely the reverse, and that it
is the duty of the court to uphold it, unless it appears that it was an invalid
and dishonest one."

This is a terse and accurate statement of the rule of law applicable
to the present case. The plaintiff was a broker or agent of the defend-
ant in the transactions in question. He was the middle-man between
the defendant and other parties, to whom sales and from whom pur-
chases of commodities were made. Like the case of *Bangs* v. *Hornick*,
just cited, as there observed by Judge BREWER, it is not a case where
the defendant, as principal on the one side, was dealing with the plain-
tiff as principal on the other. There was no contract of purchase or
sale, real or pretended, between them. He was merely a broker,—an
agent to do the defendant's bidding in transactions real or pretended.
"There is no presumption that an agent does not obey the instructions
given, or that he does not intend to obey them; and, it matters not what
the intent or supposition of the principal may be, the law will presume
that the agent obeyed the instructions that were given, and as they were
given; and, if the contrary be alleged, it must be proved."

Now, although the defendant may not have intended any real pur-

chase or sale of grain or other commodities, it is not satisfactorily proven that the parties with whom the plaintiff dealt for the defendant, did not contemplate the actual receipt of property purchased, and delivery of property sold. Just here is the difficulty with the defendant's case. The proofs do not come up to the point of showing that both or all the parties to the various transactions, regarded them simply as wagers on differences in prices. As we have seen, the test of illegality is the intention, not alone of one of the parties, but of both or all.

As before observed, these were transactions arising in Illinois, and therefore governed by the Illinois statute. The Wisconsin statute is broader in its scope. Indeed, as pointed out by Judge HOPKINS in *Re Green*, 7 Biss. 338, the statute of this state on the subject of gaming has gone further than the English statutes on the subject. *Clarke* v. *Foss, supra; Gilbert* v. *Gaugar*, 8 Biss. 214; and *Jackson* v. *Foote*, 11 Biss. 223, 12 Fed. Rep. 37,—all decided in this circuit,—were cases involving transactions under the Illinois statutes. *Clarke* v. *Foss*, in many of its prominent features, is on all fours with the case at bar, involving also the validity of settlements made by the so-called "ringing up" process, and the contracts out of which that case arose, were sustained. In that case, as in this, the evidence showed that in some of the transactions, grain was actually delivered and paid for, and in other respects, the case was very similar to that here in hand. Although not officially reported, I happen to know that an appeal was taken from the judgment of Judge BUNN in *Clarke* v. *Foss*, to the circuit court, and that, in an oral opinion delivered from the bench by Judge DRUMMOND, the contracts there involved, were sustained, and the decision of the district court was fully affirmed. In *Jackson* v. *Foote*, Judge BLODGETT decided that an agreement between a person and his broker on the Chicago Board of Trade, by which he is to deal in time contracts for the purchase and sale of grain, and settle the differences so as to avoid paying for and carrying the commodities bought, does not show an intention to deal in "options to buy or sell at a future time," such as are prohibited by the Illinois statute, though the contracts might be wagering contracts at common law, and that such statute does not cover dealing in differences. So in *Gilbert* v. *Gaugar, supra*, the same judge decided that the Illinois statute was not intended to prohibit sales of grain or other commodities for future delivery, where the seller reserves to himself a simple option as to *the time of delivery* within certain limits; and that if one makes a contract to deliver grain during a future month, at a fixed price, and, by reason of the adverse aspect of the market, directs his broker to settle with the purchasers before the maturity of the contract, this does not make the contract void as a gambling transaction, and he is liable for the differences paid by the brokers in his behalf, as well as for their commissions.

The weight of authority, therefore, in this circuit, is all one way, as applied to Illinois transactions, namely, that a simple option reserved by the seller to himself as to time of delivery of property within certain limits, and the settlement of differences upon such a contract, does not

make the contract void as a gambling transaction. The proofs must go further, and affirmatively show that it was not the intention of either seller or buyer, when the contract was made, to deliver any property; and this is not proved by showing merely the intention of one party, even coupled with the intention of his agent representing him in the transaction. In the case at bar, some of the property was actually delivered and paid for. In other instances there was a payment of differences. The actual delivery of some of the property is a fact which goes to uphold the transaction in question as lawful and valid. The mere fact that in other instances there was a settlement of differences, is not sufficient to show an original intention of both seller and buyer, when the contracts were made, not to deliver any property. This being the state of the case, I do not see how the contracts entered into by the defendant through his broker, the plaintiff, can be held to be gambling transactions, unless it be so inferred from the methods in which, in some instances, a settlement was made as a basis for arriving at differences.

In *Clarke* v. *Foss, supra,* the "ringing up" process is commented upon, and shown to be in and of itself a legitimate method of adjusting differences, in accordance with the rules of business prevailing in the clearing-houses of the country.

In *Williar* v. *Irwin, supra,* it was said by Judge GRESHAM in his charge to the jury:

"The testimony tends to show that a general custom obtained among grain commission merchants in Baltimore to the following effect: When one commission merchant, upon the order of a customer, sells to another commission merchant a quantity of grain for future delivery, and it occurs that at some other time before the maturity of the contract the same commission merchant receives an order from another customer to purchase the same or a larger quantity of the same kind of grain, for the same future delivery, and he executes this second order by making the purchase from the same commission merchant to whom he had made the sale in the other case, that then, in such case, the two commission merchants meet together, and exchange or cancel the contracts as between themselves; adjusting the difference in the prices between the two contracts, and restoring any margins that may have been put up; and from that time forth the first commission merchant holds for the benefit of the customer for whom he sold the order or contract of the purchaser for whom he bought, so that the grain of the selling customer may, when delivered, be turned in on the order or contract of the purchasing customer, and that the commission merchant is held responsible as guarantor to his customer. The evidence also tends to show a custom obtained among commission merchants in Baltimore to the further effect that, though the second transaction may have been had with a different commission merchant from the one with which the first transaction was had, yet where it can be found that a series of contracts are in existence for the sale of like grain for like delivery, so that the seller owes the wheat to the buyer to whom he sold, and he to another who owes like wheat for like delivery to the first commission merchant, that then, in such case, they settle by what they call a 'ring,' that is, they all reciprocally surrender or cancel their contracts, adjust differences in price between themselves, and surrender all margins that have been put up; that in all such cases the commission merchant substitutes the contract of another customer in place of that with the commission merchant whose con-

tract has been canceled or surrendered; and that he guaranties to his customer the performance of the contract originally made in his behalf."

This is a very good statement of what the testimony in the case at bar shows transpired between the parties, in the transactions here in question; and Judge GRESHAM held that the customs referred to were founded in commercial convenience, and that they were not in contravention of the law, but valid.

The supreme court of the United States in its review of the case in 110 U. S. 499, 4 Sup. Ct. Rep. 160, although it reversed the judgment of the court below upon another point, did not question the correctness of Judge GRESHAM's ruling upon the validity of the methods of business referred to, by which differences were adjusted.

I must hold, therefore, that, for want of adequate proof of an actual intention on the part of both the defendant and the parties with whom the plaintiff as his agent dealt, not to make real sales and purchases, or not to make actual deliveries of property sold and purchased, the contention that the contracts were mere gambling transactions is not established.

It has, however, been a further question with the court whether, upon another point, the case was within the ruling of the supreme court of the United States in *Williar* v. *Irwin*, wherein it was held that the defendant was not liable to his brokers for moneys paid in settlement of differences, because it was not shown that the methods of settlement by means of which differences were arrived at were not known to him, and therefore the settlements were not made with his assent. The plaintiffs in that case were commission merchants and grain brokers in Baltimore, and the defendant and his deceased partner were engaged in business in Indiana. The contracts of sale were made and settled by the plaintiffs on account of their customers according to the custom of the grain and flour exchange in Baltimore, of which they were members, and there was no proof whatever that the defendants, living thus remote from the scene of operations, had any knowledge of the customs of the exchange. The court below decided that the defendants, having employed the plaintiffs as grain commission merchants, to engage in transactions for them on the exchange, were bound by the general usages and customs of business there prevailing, whether they had knowledge of them or not. This ruling was held by the supreme court to have been error, not on the ground that the customs tended in any way to show that the transactions were wagers, but because they worked a material change in the principal's rights, and the obligations of third parties to him, and therefore could not be binding upon him without his assent.

The evidence in the case at bar shows that the defendant Vosburgh must have been familiar with the methods and usages of business on the Chicago Board of Trade at the time when the transactions between him and the plaintiff occurred. He lived not very remote from Chicago; was frequently in that city; and had for a considerable time been accustomed to transact business on the board of trade through brokers whom he employed. He sold butter and cheese on the board of trade at Elgin,

Illinois; occasionally visited the board of trade in Chicago with the plaintiff; and the plaintiff testifies unqualifiedly that the defendant was familiar with the methods of business upon the board. This testimony is not contradicted by the defendant, and he nowhere in his testimony attempts to deny knowledge of such methods of business. He was in constant communication with the plaintiff, gave orders for purchases and sales by letter and telegraph, received statements from the plaintiff as often as transactions took place, and no other conclusion is consistent with all the facts, than that he must have known the manner in which various trades made in his behalf, were closed out. The case, therefore, in its facts upon this point, is unlike that of *Williar* v. *Irwin*.

Appreciating, as I do, as indicated in the outset, the hardship probably entailed upon the defendant by an adverse ruling in this case, the court feels constrained to hold, upon the testimony as it is presented, and upon what it conceives to be the weight of authority, especially in this circuit, that the defendant is liable to the plaintiff for the amount of the plaintiff's claim for advances and commissions in the transactions in dispute.