## ÆTNA INDEMNITY CO. v. LADD et al.

(Circuit Court of Appeals, Ninth Circuit. February 6, 1905.)

### No. 1,106.

**1. ASSIGNMENTS—CONSTRUCTION—OPERATION.**

General agents of a surety company were authorized and directed by their principal to require any contractor for which it became surety to transfer to it his plant whenever he became unable to carry on the contract, in order that the surety company might prosecute the same to completion. A contractor for which the company became surety became financially embarrassed and unable to successfully prosecute its contract. Thereupon the general agents, by legal proceedings and arrangements, with the contractor and its creditors, took possession of the plant and entered on the completion of the contract. They also procured an advancement of money on the contract from the obligee. The instrument executed by the contractor to the surety company recited that the contract was assigned as security for the payment of such sum of money. The surety company did not in any way repudiate or disaffirm, but, rather, recognized, the acts of its agents in the premises. *Held* that, notwithstanding the recital in the instrument of assignment, the transaction in fact constituted an absolute assignment of the contract, and not merely an assignment for security.

**2. PRINCIPAL AND AGENT—AUTHORITY OF AGENT—REPUDIATION.**

The act of a principal in protesting its general agent's draft for funds to be used on contracts undertaken by the agent did not constitute a repudiation of the action of the agent in assuming the contract, but was a ratification thereof, where the only reason assigned for dishonoring the draft was that the funds were not needed.

**3. APPEAL—HARMLESS ERROR.**

Where a witness had testified that defendant's agent had been carrying on the work on certain contracts, and that a subagent, as trustee, had been in immediate charge of the work, the refusal of a motion to exclude further testimony that the witness believed that the contract was completed by the subagent as trustee for defendant was, if error, harmless.

**4. PRINCIPAL AND AGENT—AUTHORITY OF AGENT—EVIDENCE—TESTIMONY OF AGENT.**

An agent may testify that he acted for and in behalf of his principal in borrowing money, but such testimony does not bind his principal or prejudice its rights.

[Ed. Note.—For cases in point, see vol. 40, Cent. Dig. Principal and Agent, §§ 39, 40, 413–416.]

**5. MONEY LENT—EVIDENCE—VARIANCE.**

Under a complaint alleging merely the advancement of money to defendant for its use and benefit, a bond executed by defendant to plaintiff, reciting defendant's need of the money, and the advancement of the same by plaintiff, is admissible to show the nature of the transaction between the parties.

**6. PLEADING—ELECTION—EFFECT.**

Where a complaint was in two counts—the first for money lent, and the second on a bond given to secure the payment of such money—an election to stand upon the first count did not constitute a waiver of the right to use the bond in evidence if it became necessary or proper to do so.

**7. PRINCIPAL AND SURETY—ACTIONS—EVIDENCE—JUDGMENTS.**

In an action against a surety to recover money loaned to it to complete contracts on the principal's becoming unable to perform the same, the record of a judgment, to which the surety appeared to be a party, was admissible, where it tended to show that the surety assumed to own and have possession of the property and plant of its principal.

**8. APPEAL—QUESTIONS NOT RAISED BELOW.**

An objection that the transcript of a judgment introduced in evidence was not properly certified cannot be first raised on appeal.

**9. PRINCIPAL AND AGENT—AUTHORITY OF AGENT—INSTRUCTIONS.**

On the issue of the authority of the general state agent of a surety company, a charge defining a general agent as one empowered to transact all his principal's business was not misleading, as the jury must have understood it to refer only to the kin l of business which the surety company was authorized to transact.

**10. SAME.**

Third persons acting in good faith are justified in relying upon the apparent authority of one held out as the general agent of his principal, notwithstanding secret instructions and restrictions placed by the principal upon such authority. The principal is bound for the acts of the general agent within the scope of his apparent authority, even though such acts are not reported by the agent to the principal. Such third persons may assume that the agent will promptly communicate to the principal all dealings entered into by him on the principal's behalf.

**11. SAME—INSTRUCTIONS—INCONSISTENCY.**

On the issue of the authority of the general agent of a surety company, the court charged that third parties cannot rely on the agent's assumption of authority, but must, at their peril, observe that the agent keeps within his powers, and that if plaintiffs loaned money to defendant's agent, and the agent did not have authority to borrow the money, the verdict must be for defendant. This instruction was qualified by a further charge that it was the agent's duty to protect their principal's interests, and whether, in the discharge of that duty, they were warranted in borrowing the money, was a question for the jury, and, if they were so warranted, the verdict should be for plaintiff. *Held*, that the qualification of the instruction was not erroneous or inconsistent with the instruction qualified.

**12. TRIAL—DIRECTED VERDICTS—TEST OF PROPRIETY.**

The test to determine whether a case shall be taken from the jury is whether or not the undisputed evidence is so conclusive that the court would be compelled to set aside a verdict rendered in opposition to it.

13. PRINCIPAL AND AGENT—ACTS OF AGENT—RATIFICATION—EVIDENCE—QUESTIONS FOR JURY.

In an action against a surety company to recover money loaned to it through its general agent, evidence *held* sufficient to authorize the submission to the jury of the issue of ratification by the surety company of the agent's act in borrowing the money.

In Error to the Circuit Court of the United States for the District of Oregon.

·See 128 Fed. 298.

The Ætna Indemnity Company, the plaintiff in error, a corporation organized under the laws of the state of Connecticut, having among other powers that of prosecuting a general surety business, and, as surety, to execute all classes of bonds and undertakings, including contractors' bonds, had prior to March, 1902, complied with the laws of the states of Washington and Oregon regulating foreign surety companies, and, through its agents, Clemens & O'Bryan, of Portland, Or., was engaged in the surety business in both said states. On January 7, 1902, the board of directors of the plaintiff in error had passed the following resolution: "Voted: That W. J. Clemens be and he is hereby appointed attorney in fact for this company, and that he be and he is hereby authorized and empowered to execute and deliver and attach the seal of the company to any and all bonds and undertakings for or on behalf of the company in the business of guaranteeing the fidelity of persons holding places of public or private trust and the performance of contracts other than insurance policies, and executing or guaranteeing bonds and undertakings required or permitted in all actions or proceedings or by law required." On April 2, 1901, the board of directors passed·the following resolution: "Voted: That W. J. Clemens and J. H. O'Bryan be and they hereby are appointed resident assistant secretaries of this company at Portland, Oregon, and that each one of them be and he is hereby authorized and empowered to execute and deliver and attach the seal of the company to any and all bonds and undertakings for or on behalf of the company in its business of guaranteeing the fidelity of persons holding places of public or private trust and the performance of contracts other than insurance policies, and executing or guaranteeing bonds and undertakings required or permitted in all actions or proceedings or by law required, such bonds and undertakings, however, to be attested in every instance by W. W. Cotton, attorney in fact." On April 29th the plaintiff in error executed to their agents the following certificate: "This is to certify that Clemens & O'Bryan of Portland, Or., are hereby appointed agents for the Ætna Indemnity Company, and are authorized to perform all acts and duties incidental to such appointment." Clemens & O'Bryan, as such agents, had the power to appoint and did appoint their subagents at different cities in Oregon and Washington. Their subagents so appointed at Tacoma were Seeley & Co. Clemens & O'Bryan had been instructed by the plaintiff in error, in cases where the latter became surety for contractors, to take from such contractors collateral agreements or counter agreements executed in its own favor and for its own protection, and, in cases where such contractors became unable to complete or carry on their contracts, to take assignments of such plant as they might own, in order that the plaintiff in error might use the same in the prosecution of such contract to completion.

The Hardy Shipbuilding Company, a corporation of the state of Washington, was operating a shipbuilding plant at Tacoma. It was about to enter into contracts with the firm of Sudden & Christensen, of San Francisco, for the construction of a barkentine afterwards known as the "John C. Meyer," with A. W. Horn for the construction of a steamboat afterward known as the "Georgia," and with the Pacific Cold Storage Company for the construction of a barge. Bonds for the fulfillment of these contracts were required by Sudden & Christensen in the sum of $15,000, by A. W. Horn in the sum of $10,000, and by the Pacific Cold Storage Company in the sum of $2,000. The Hardy Shipbuilding Company made application to Seeley & Co., subagents of the plaintiff in error, requesting that the latter become surety upon such

bonds. The application was transmitted to Clemens & O'Bryan, the general agents; and, in consideration of a premium of 1 per cent. paid on the amounts of said bonds, the plaintiff in error became the surety, and guarantied in those amounts the performance of said contracts. The Hardy Shipbuilding Company executed to the plaintiff in error in each case the counter agreement so provided for, in which it agreed, among other things, that, in case it became unable to complete its contracts, it would assign its plant and property to the plaintiff in error, in order that the latter might prosecute such contracts to completion, and it authorized the latter to receive all deferred payments in the event of such breach of contract or default on its own part. The applications, bonds, and counter agreements were forwarded by Clemens & O'Bryan to the home office of the plaintiff in error. About May 13, 1902, Clemens & O'Bryan were notified by their subagent at Tacoma that the Hardy Shipbuilding Company was in trouble. On the day following, Mr. O'Bryan went to Tacoma, and there ascertained that there were outstanding pay checks on the April pay roll of the shipbuilding company of about $5,000, payable on May 10th, and that there were no funds available to pay the same. On examining the books of the shipbuilding company, and upon the representations of Mr. Hardy that the embarrassment was temporary only, he telegraphed to Sudden & Christensen, of San Francisco, requesting them to make an advance of $6,000 upon the next payment to fall due upon the John C. Meyers contract. Sudden & Christensen answered that they would do so upon the authority of the Ætna Indemnity Company, which authority was accordingly given by Clemens & O'Bryan, as general agents of that company. A representative of Sudden & Christensen met Mr. Seeley, the subagent, and Mr. O'Bryan and Mr. Hardy, in Tacoma, on May 16th. O'Bryan presented an order which had been given him the day before by the Hardy Shipbuilding Company, addressed to Sudden & Christensen, and requesting them to pay as follows: "Please pay the $6,000.00 that you have to-day consented to advance on barkentine contract to the Ætna Indemnity Company, who will disburse the money in payment for labor and material thereon." Sudden & Christensen thereupon paid to O'Bryan the $6,000, and the money was deposited in a bank at Tacoma to the joint credit of the plaintiff in error and the Hardy Shipbuilding Company. The board of trustees of the Hardy Shipbuilding Company had on May 15th adopted a resolution reciting the facts in the case, and thus concluding: "Be it resolved: That the president and secretary of this company be, and they are, hereby authorized to execute in the name of the company an assignment of the interests of this company of the aforesaid contracts as security for the payment of the said sum of six thousand dollars." On May 16th the shipbuilding company executed to the plaintiff in error an assignment of all its right, title, and interest in the three contracts. O'Bryan then put Seeley & Co. in charge of the plant and the unfinished vessels, and returned to Portland. On May 27th Clemens & O'Bryan wrote to the plaintiff in error in regard to the embarrassment of the shipbuilding company and its unfinished contracts; stating that, in their opinion, there was a profit in each contract, and added: "However, as we helped them out by giving our authority to Sudden & Christensen to make an advance payment, we took an assignment of all their contracts, copy of which we enclose herewith, and at the same time, until these contracts are finished, all money of the firm is deposited in the name of the Hardy Shipbuilding Company and the Ætna Indemnity Company, and all checks are signed by Mr. Hardy, President of the Shipbuilding Company, and countersigned by our Tacoma agent, Mr. Seeley, and every check must show for just what contract it is for." On June 10th the plaintiff in error wrote, acknowledging the receipt of that communication. From and after May 16th, Seeley continued in possession and charge of the shipyard and the work on the vessels covered by the three contracts.

About the middle of June, one Ralph W. Smith, who held a chattel mortgage on the shipbuilding plant, proceeded to foreclose it, and placed the sheriff in charge of the yard, thereby causing the work therein to cease. Thereupon Mr. Clemens induced the Pacific National Bank, which held a mortgage on the real estate of the yard, to institute a foreclosure suit. The suit was begun, Smith was made a party defendant, and sale under his chattel mort-

gage was enjoined. By the authority of Clemens & O'Bryan, the firm of Remington & Reynolds appeared as attorneys therein for the plaintiff in error, and filed in its name a complaint in intervention, in which it was alleged as follows: "That on or about said 15th day of May, 1902, pursuant to and in accordance with the terms and provisions of the hereinbefore described agreement set out in paragraph 15 of this complaint, the said Hardy Shipbuilding Company and John B. Hardy, being unable to carry on the aforementioned contracts, or either of them, did duly assign, transfer, and set over to the said intervener both of the said shipbuilding contracts, together with the said shipbuilding plant, including all said shops, machines, tools, implements located on the premises hereinbefore described, and on or about said 15th day of May, 1902, did place the said intervener in possession of the said real estate, and did duly deliver to said intervener the actual, exclusive, undisputed, open, notorious, and visible possession of all shops, implements, tools, machines, materials, and supplies, and all personal property of every nature, kind, or description, located on the real estate above described, and ever since said date the said plaintiff in intervention has been in the open, notorious, and exclusive possession and control of all of said real estate and personal property, for the purpose of completing the said ships, in pursuance of and according to the terms of the said collateral agreements hereinbefore set forth." On June 24th a stipulation was filed in said foreclosure suit whereby it was agreed between the parties thereto that the temporary receiver therein forthwith turn over all the personal property in his possession to Claude M. Seeley, as trustee for the intervener, and on June 25th an order was entered in said suit according to such stipulation. Seeley thereafter continued to operate the shipyard as before. On July 7, 1902, Clemens & O'Bryan reported to the plaintiff in error the facts of the foreclosure suit as follows: "More than a week ago the writer was called to Tacoma owing to some complications which had arisen and which should not have arisen. The party holding a chattel mortgage had made an agreement with the Hardy Shipbuilding Company, by which the plant was not to be disturbed and these contracts were to be completed. However, the man by the name of Ralph W. Smith, who it now turns out, was the general agent of the American Bonding Trust Company, appeared on the scene and decided that, inasmuch as we had these contracts on our hands, it was a good time for him to get his money out of the plant. The plant, by the way, is easily worth $80,000.00 and had Mr. Smith left us alone, we would have had no difficulty in completing our contracts without loss. On arriving in Tacoma, we found that Mr. Smith had foreclosed his chattel mortgage and had the sheriff in possession of the plant. He informed us that unless we paid off his claim, he would order the place shut down. After endeavoring to make some arrangement with him, by which the plant could continue, we found that he was a very unreliable man, and his statements could not be depended on. While negotiations were pending, he ordered the sheriff to close down the shop. The writer then interested the Pacific National Bank, which bank is a branch of our Ladd & Tilton Bank, and got them to foreclose their real estate mortgage, asked the court for a temporary injunction and restraining order to keep Smith from selling some of the real estate. We then filed an attachment suit, asked for a receiver, got another firm to attach them, finally secured a temporary receiver, and when Smith found we had matters all tied up, he stipulated with us to the end that we now have the record title to the whole plant and have practically made arrangements to sell the plant, together with our contracts, one of which is about completed. We will come out even, with all expenses of adjustment and attorney's fees paid. Will advise you more in detail shortly. The writer had to remain in Tacoma for over a week, and consequently things have piled up some. We needed the counter-agreements very much so that we could have put them on record; as we did not have them, we had to make other arrangements to secure possession of the plant, and did so. We have left no stone unturned and are absolutely secure from everybody. In order to get the Kingsford Foundry and Machine Works to release some of the machinery to us, which had been shipped the Hardy Shipbuilding Co., we told them we would pay the freight, as we had taken over the contracts and moneys on hand. What we wanted them to do was

simply to advise the Northern Pacific Railroad to release the machinery on payment of the freight. But it seems the agent signed his name and did not make this telegram clear. However, the matter has all been settled satisfactorily."

In the meantime the boilers and engines for the steamboat Georgia arrived in Tacoma. The Kingsford Foundry & Machine Works, the makers of the machinery, had notified the railroad company not to deliver the same until its bill of some $6,000 was paid. There was no money to meet the bill. Mr. Clemens went to the defendants in error; told them that the plaintiff in error had taken over the contracts of the Hardy Shipbuilding Company, and that some money was needed at once in order to get the machinery for the Georgia, and to carry on other work in anticipation of the next payment to be made on the contracts. On June 24th the defendants in error agreed to advance sums of money up to $10,000—the same to be repaid out of moneys derived from the contracts or otherwise—and on that date they advanced $6,500 upon the agreement. The money was sent by Clemens & O'Bryan to Seeley, at Tacoma, who paid the bill of the machine works, amounting to more than $6,000, and applied the remainder upon the pay rolls for work done on the Georgia and the John C. Meyers. On July 9th the defendants in error advanced an additional sum of $3,000 to Clemens & O'Bryan, and that sum was paid on account of labor and supplies to the John C. Meyers and the Georgia contracts. Later it appeared that the Hardy Shipbuilding Company had not informed Clemens & O'Bryan of its true condition, and that other bills for materials and supplies remained outstanding and that the contracts were being completed at a loss. On August 4th Clemens & O'Bryan wrote to the plaintiff in error as follows: "What we meant to say in our last letter was that we would complete this contract to the best of our ability, and we had the record title to the plant in the name of Seeley & Company, trustee for the Ætna Indemnity Company, and arrangements have been made for the sale of this plant for enough to pay for any indebtedness and any loss on the contract and it now appears that there will be a loss, and to pay our expenses in the matter, which were quite heavy, owing to the necessary lawsuits to obtain possession of the property, we are having to advance some money to complete the contract and are having a detailed statement of the amount and situation prepared and will forward them to you shortly." On August 5th Clemens & O'Bryan wrote the plaintiff in error as follows: "But the thing that troubles us is that we will have to put up some more money in order to carry the work along, as everything we buy we seem to have to pay cash for, and, of course, we have to keep the labor paid up." On September 19th the plaintiff in error telegraphed to the defendants in error: "Copy obligation dated June 24 purporting to bind this company, just received. You are hereby advised same is not valid." On the following day the defendants in error telegraphed to the plaintiff in error in answer thereto as follows: "Telegram yesterday received. Do we understand that you repudiate the actions of your agents Clemens & O'Bryan in their dealings with us in your behalf?" No answer was sent to this inquiry. Further facts pertinent to the assignments of error are stated hereinafter in the opinion. On November 29, 1902, the defendants in error brought the present action against the plaintiff in error to recover upon the bond so executed on June 24, 1902, which bond reads as follows: "Know all men by these presents, that the Ætna Indemnity Company, a corporation created and existing under the laws of the State of Connecticut, and whose principal office is located at Hartford, Conn., is held and firmly bound unto Ladd & Tilton, Bankers, of Portland, Oregon, in the full and just sum of ten thousand dollars (10,000.00) good and lawful money of the United States of America, to the payment of which sum, well and truly to be made, the said Ætna Indemnity Company binds itself, its successors and assigns, jointly and severally firmly by these presents, signed sealed and dated this 24th day of June, A. D. 1902. Whereas, the Ætna Indemnity Company, owing to the failure of John B. Hardy and the Hardy Shipbuilding Company, to complete two contracts, viz.: One to build a barkentine for Sudden & Christensen, and one to build a steamer for Captain Horn, is now completing said contracts, and it becomes necessary to

furnish money for the prosecution of the work, payment of materials and other miscellaneous items, and Ladd & Tilton, Bankers, are advancing on account of the aforesaid contracts, money, not to exceed in the aggregate principal and interest, ten thousand dollars ($10,000.00). Now, therefore, if the said money shall be repaid out of the money received for the aforesaid contracts or in any other manner, then this obligation shall be void; otherwise to remain in full force and effect." And the defendants in error, in their complaint, alleged that in conformity with said bond they had advanced to the plaintiff in error, by Clemens & O'Bryan, its general agents, on June 24, 1902, the sum of $6,500, and on July 9, 1902, the further sum of $3,000, all of which moneys were expended by the plaintiff in error upon said vessels, and were necessary for such purpose. The plaintiff in error answered, denying that it had executed said bond or that it was liable thereon. The case was tried before a jury, and a verdict was returned for the defendants in error for the sum of $9,500, with interest thereon, upon which judgment was entered by the court.

Campbell & Powell and Frederick V. Holman, for plaintiff in error.

Williams, Wood & Linthicum and W. C. Bristol, for defendants in error.

Before GILBERT and ROSS, Circuit Judges, and HAWLEY, District Judge.

GILBERT, Circuit Judge, after stating the case as above, delivered the opinion of the court.

It is assigned as error that the trial court permitted the witness Clemens to testify that the money received from the defendants in error was paid out for the benefit of the plaintiff in error on contracts for which it had become surety, and which had been assigned to it. It is urged that the contracts had been assigned merely as security for an advancement of $6,000 by Sudden & Christensen to the Hardy Shipbuilding Company, and for no other purpose. It is true that the assignment, in its terms, recites that it was made as security for the payment of said sum of $6,000. But from and after its date, the evidence shows, it was, in fact treated by both the parties thereto as an absolute assignment for the benefit and protection of the plaintiff in error. Clemens & O'Bryan, the general agents of the plaintiff in error, had general authority to require any contractor for which it became surety to transfer to it his plant whenever he became unable to carry on the contract, in order that the surety company might use the same in the prosecution of the contract to completion. On March 6, 1902, the plaintiff in error had written to its general agents as follows:

"When executing bonds of this character, you must always bear in mind that the Surety Company signing such a bond becomes a co-contractor, and in the event the contractor defaults on any part of the work, the company must step in and complete it or else stand the loss."

On April 25, 1902, it had written its general agents in reference to another bond as follows:

"At any time should you perceive indication that the work is not progressing in a satisfactory manner, we shall rely on you to take immediate steps to protect our interests."

On the same date, in reference to another bond, it had written:

"If, at any time, there should be an indication that the work is not progressing to the satisfaction of the obligee, kindly take immediate steps to safeguard our interest."

On June 16, 1902, it had directed its agents to take whatever action may be necessary in the premises "to save us from any ultimate loss." There were other communications of a similar nature, all tending to show that the plaintiff in error at all times had in contemplation the contingency of assuming the completion of any of the contracts upon which it was surety, whenever it became necessary to do so for its own protection, and that it looked to its general agents to act for it in that capacity. Evidence went to the jury tending to show that the home office was advised of the actions of its general agents in carrying on and completing the contracts. Thus on May 27th the agents wrote, notifying the company of the advance made by Sudden & Christensen and the assignment of the contracts. They added:

"Until these contracts are finished, all money of the firm is deposited in the name of the Hardy Shipbuilding Company and the Ætna Indemnity Company, and all checks are signed by Mr. Hardy, president of the Shipbuilding Company, and countersigned by our Tacoma agent."

On July 7th they wrote:

"We now have the record title to the whole plant, and have practically made arrangements to sell the plant, together with our contracts. * * * In order to get the Kingsford Foundry & Machine Works to release some of the machinery to us, which had been shipped the Hardy Shipbuilding Company, we told them we would pay the freight as we had taken over the contracts and moneys on hand."

On August 4th they wrote:

"What we meant to say in our last letter was that we would complete this contract to the best of our ability."

On August 5th they wrote:

"But the thing that troubles us is that we will have to put up some more money in order to carry the work along as everything we buy we seem to have to pay cash for, and of course we have to keep the labor paid up."

During all this time no answer was made by the plaintiff in error disaffirming any of the acts of its general agents. It is true that on or about August 21st it protested its general agent's draft of $5,000 to be used on the contracts, but on August 23d it explained its action in so doing by telegraphing to its agents as follows:

"Sufficient money appears to be left to complete Hardy contracts. You must arrange for advances from the owners."

This answer, so far from repudiating the action of the general agents in assuming the contract, was clearly a ratification thereof, since the only reason assigned for not advancing the money was that it was unnecessary to do so. On August 25th the agents telegraphed to the plaintiff in error as follows:

"Ladds Bank advanced money for material and labor. Owners scared, won't pay anything. Bank insists immediate payment. Must shut down works."

To this the plaintiff in error replied:

"Prorate payment due among materialmen, authorizing owners to pay them direct."

On August 26th the plaintiff in error wrote the general agents as follows:

"We will be pleased to have you forward a report showing just what portion of the work has been completed, together with the payments made, also the date of the letter and advice as to whether such payments have been properly applied in settlement of bills for labor and materials."

Further correspondence followed, but in none of it did the plaintiff in error deny the authority of its agents to assume the completion of the contracts. We find no error, therefore, in the ruling of the court admitting in evidence the testimony so objected to.

It is contended that the court erred in permitting the witness Clemens to answer the question, "By whom was the boat Georgia completed?" to which he answered, "The boat was completed by Mr. Seeley, trustee for the Ætna Indemnity Company, as we believe." It is urged that, in so answering, the witness stated a legal conclusion, and that the court should have sustained the motion of defendant in error to strike out the answer. The question so propounded did not necessarily call for an answer stating a legal conclusion. The witness had previously testified that Clemens & O'Bryan had been carrying on the work on these contracts, and, that "Mr. Seeley, trustee, had been in charge of the plant at Tacoma." In answering that the work was completed "by Mr. Seeley, trustee for the Ætna Indemnity Company, as we believe," he was but stating his understanding of the capacity in which he and his partners had acted in completing the contract. If it was error to deny the motion to exclude the testimony, it was harmless error, which could not have prejudiced the plaintiff in error.

Of similar import is the assignment that the court erred in permitting the witness Clemens to testify in answer to the question on whose behalf the additional sum of $3,000 was obtained from the defendants in error, to answer, "Ætna Indemnity Company." It was proper for the witness to testify in what capacity he was acting in obtaining this money, for whom he acted when he borrowed it, and his understanding of the relation he bore to the transaction. His statement could not bind the plaintiff in error, nor prejudice its rights.

It is assigned as error that the court admitted in evidence the bond which was executed to the defendants in error at the time when they made their first advance of money to be expended on the contracts. The complaint in the present action contained two counts. In the first it was alleged that the plaintiff in error applied to the defendants in error for moneys wherewith to pay for material and laborers, and that in accordance therewith the money had been advanced to the use and benefit of the plaintiff in error. In the second count the defendants in error declared upon the bond. At the beginning of the trial, counsel for the plaintiff in error moved that the defendants in error be required to elect on which cause

of action they would stand. The motion was allowed, and the defendants in error elected to stand upon the first. It is urged that thereby they abandoned all cause of action, if any they had, on the bond, and waived all rights thereunder, and that therefore the bond became inadmissible in evidence for any purpose. But it appears that on the cross-examination of the witness Clemens the plaintiff in error drew out the fact that a bond had been given, guarantying the money so loaned, and that in addition thereto the notes of Clemens & O'Bryan had been required by the defendants in error, and that the notes had not been paid. It was upon the redirect examination of the witness that the defendants in error offered the bond to show what the transaction was, since that instrument represented in its recitals that the Ætna Indemnity Company was assuming to complete the contracts; that it needed money, and was about to obtain the same from defendants in error. We think it was clearly admissible as showing the nature of the transaction between the parties, and upon what the defendants in error acted. By electing to stand upon the first count of their complaint, the defendants in error cannot be said to have waived all right to use the bond in evidence whenever it became proper or necessary to do so.

It is contended that the court erred in admitting in evidence the transcript of the proceedings in the superior court of the state of Washington, in and for Pierce county, in the suit instituted by the Pacific National Bank to foreclose its mortgage on the plant of the Hardy Shipbuilding Company, in which suit the plaintiff in error, by Remington & Reynolds, appeared to be an intervener. Objection to the transcript was made on the ground that it was incompetent, irrelevant, and immaterial, and because no authority was shown in Remington & Reynolds to act for the plaintiff in error. The transcript was offered in evidence at the close of the deposition of F. S. Blattner, a witness for the plaintiff in error. He had deposed, without objection, that, in the litigation so referred to, "Remington & Reynolds represented the Ætna Indemnity Company." When the transcript was offered in evidence by defendants in error, the court inquired whether Remington & Reynolds were employed by the company or by the general agents, to which counsel for the defendants in error replied, "It does not say in that deposition." Counsel for the plaintiff in error contended that it could not be shown that authority was given by any one but Clemens & O'Bryan. The court admitted the transcript in evidence, but stated to counsel for plaintiff in error, "You may show, if you can, afterward, that the parties who acted for the Ætna Indemnity Company derived their authority from these same agents." Counsel for the plaintiff in error complied with this suggestion by introducing the testimony of Mr. Pegram, the secretary of the plaintiff in error, who testified that no one was authorized to appear for the plaintiff in error in that litigation. No motion was made to strike the transcript from the record at any subsequent time. When it was afterward read to the jury, objection was made, not on the ground that the attorneys assuming to represent the plaintiff in er-

ror therein had no authority to do so, but on the ground that the transcript itself was incompetent, irrelevant, and immaterial evidence. From the record as it comes to us, we cannot say that the court erred in ruling as it did when the transcript was first offered in evidence, supported as the transcript was at that time by the statement of the witness for the plaintiff in error that Remington & Reynolds appeared in the litigation as its attorneys, nor in subsequently permitting the transcript to be read to the jury, for the evidence so offered was not incompetent, irrelevant, nor immaterial, since it was a judgment record to which the plaintiff in error appeared to be a party, and it tended to show that at the time of that litigation the plaintiff in error assumed to own and to have possession of all of the property and plant of the Hardy Shipbuilding Company. Again, while no direct authority from the plaintiff in error to the attorneys who appeared for it in that suit was shown, it was proven that on July 7th the plaintiff in error was advised of that litigation, and was informed that Clemens & O'Bryan had induced the Pacific National Bank to bring its foreclosure suit, and had, on behalf of the plaintiff in error, filed an attachment suit therein, asking for a receiver, and had, by stipulation at the end of the litigation, obtained "the record title to the whole plant." It must have known that it was impossible to accomplish all this without representation by an attorney in the litigation. It was advised also by the letter of its agents of August 4th that the latter had incurred heavy expenses, "owing to the necessary lawsuits to obtain possession of the property." The objection that the transcript was not properly certified, not having been made in the court below, cannot be heard in this court, since the defect was one which might have been remedied if timely objection had been made.

It is contended that the court erred in instructing the jury as follows: "A general agent is defined under the law to be one empowered to transact all his principal's business." It is said that by this instruction the jury were informed that Clemens & O'Bryan had all the authority of the president, the secretary, and the board of directors of the plaintiff in error, and that, even if the instruction were correct as applied to a natural person, it could not apply to a corporation. The instruction so given is sustained by the text of 1 Parsons on Contracts (5th Ed.) 40; Story on Agency, § 17, and by Home Life Ins. Co. v. Pierce, 75 Ill. 435; Cruzan v. Smith et al., 41 Ind. 297; Montgomery Furniture Co. v. Hardaway, 104 Ala. 100, 16 South. 29; Fire Ins. Co. v. Building Association, 43 N. J. Law 652; and numerous other decisions. In 1 Am. & Eng. Enc. of Law (2d Ed.) a general agent is defined to be "one who is authorized to do all acts connected with a particular trade, business or employment." We are unable to see how the jury could have been misled by the instruction, for they must have understood it to refer only to the kind of business which the plaintiff in error was by its articles authorized to conduct. That business in the states of Oregon and Washington was placed in the charge of Clemens & O'Bryan as general agents. The portion of the charge so excepted to must

be taken in connection with the remainder of the charge on the same subject. The court proceeded to say:

"(1) Where a person is by the principal held out to be the general agent of the principal, third persons acting in good faith are justified in relying upon the apparent authority of such agent, notwithstanding secret instructions and restriction in point of fact placed by the principal upon such authority. The principal is bound to third parties for the acts of his general agent within the scope of his apparent authority, even though such acts are not reported by the agent to the principal, for the acts of the agent are the acts of the principal. If you find from the evidence that Clemens & O'Bryan were held out by defendant to be its general agents, plaintiffs had a right to assume that such agents would promptly communicate with their principal all dealings entered into between plaintiffs and such agents assuming to act on behalf of the defendant, if you find that plaintiffs had any dealings with said Clemens & O'Bryan as general agents of the company. (2) I charge you that third parties dealing with an agent are put upon their guard by the very fact, and must do so at their own risk. They cannot rely upon the agent's assumption of authority, but are to be regarded as dealing with the powers before them, and must, at their peril, observe that the act done by the agent is legally identical with the act authorized by the power. Therefore, if Ladd & Tilton, the plaintiffs, loaned the ninety-five hundred dollars ($9,500) sued for in this action, or any part thereof, to Clemens & O'Bryan, as agents for the defendant, and if you find that Clemens & O'Bryan did not have authority to borrow money for the defendant, then your verdict must be for the defendant, subject to the qualification which the instruction I will presently give you makes of this instruction."

Error is assigned to all of these instructions except the last, but they are believed to be correct and well sustained by authority. The Distilled Spirits, 11 Wall. 356, 367, 20 L. Ed. 167; Dysart v. Mo., K. & T. Ry. Co., 122 Fed. 228, 58 C. C. A. 592; Anderson v. National Surety Co. (Pa.) 46 Atl. 307; and Knapp v. Express Co., 55 N. H. 348, 353.

The foregoing instruction marked "2" was, with the exception of the qualification at the end thereof, given at the request of the plaintiff in error. It is contended that the court erred in qualifying that instruction by thereafter adding the following:

"It was the duty of Clemens & O'Bryan to protect the interests, so far as they were able, of the defendant company. Whether in the discharge of this duty they were warranted in borrowing the money for the recovery of which this action is brought in order to prevent default on the contract guarantied by the company, and thus save the company from liability, is a question submitted to you. If the agents were warranted, under the circumstances, in borrowing such money, then your verdict should be for the plaintiffs."

It is said that these instructions are inconsistent, that the latter qualifies the former, and that the qualification itself is contrary to law. When the whole charge is considered in its bearing on these instructions, no error or inconsistency is found in them. In instructing the jury that, if they found that Clemens & O'Bryan did not have authority to borrow money for the defendant, their verdict must be for the defendant, the court had reference to authority, either actual or apparent. It was the duty of Clemens & O'Bryan, as it is of all agents, to protect the interest of their principal. It was for the jury to find whether there was either apparent or actual authority to borrow the money. If they found, under all the facts and circumstances disclosed in the evidence, that, upon

the proof of powers which were placed before the defendants in error, it appeared that the general agents were warranted in borrowing the money, the jury were told that it was their duty to return a verdict for the defendants in error. On the other hand, if the jury found that the dealings between the principal and its agents were such as to show that there was express authority to borrow money, the defendants in error were entitled to a verdict, and there was no occasion to consider the question of the apparent authority of the general agents.

It is contended that the trial court erred in denying the motion of the plaintiff in error that the jury be instructed to return a verdict in its favor. In other words, the contention is that there was no evidence before the jury to sustain a verdict for the defendants in error. In determining whether a case shall be taken from the jury, the test question is whether or not the undisputed evidence is so conclusive that the court would be compelled to set aside a verdict rendered in opposition to it. Elliott v. Chicago, Milwaukee, etc., Railway, 150 U. S. 245, 14 Sup. Ct. 85, 37 L. Ed. 1068. The evidence in the case has already, to some extent, been reviewed. In addition to what has been said, it may be observed, briefly, that Clemens & O'Bryan were appointed assistant secretaries of the plaintiff in error, and were made its general agents, and were by the plaintiff in error advertised as such. Before any of the contracts in the present suit were made, the plaintiff in error wrote to Clemens & O'Bryan, "We have written to Stratton that we have given you the general agency for Washington, and you may do as you see fit in regard to having him represent you." Clemens & O'Bryan were given authority to appoint subagents, and their appointments were recognized. On January 28, 1902, the plaintiff in error wrote them, "We do not interfere with anything in the territory of our general agents." The plaintiff in error, as we have seen, authorized the agents to take counterbonds from contractors, and informed them that its course of business was to provide for the contingency of becoming a co-contractor on every contract for which it became surety. It repeatedly advised them in regard to other contracts on which it had become surety through their agency, and directed them to take immediate steps "to protect our interests"; "to take immediate steps to safeguard that interest"; "We shall rely on you to take immediate steps to protect our interest;" "We would suggest that you follow the matter up closely and thereby safeguard our interest;" "Take whatever action may be necessary in the premises to save us from any ultimate loss." In the view which we take of the evidence bearing upon the motion for an instructed verdict, it becomes unnecessary to consider the question whether the general agency so created carried with it by implication the power to borrow money. There was evidence before the jury tending to show that the plaintiff in error, in its dealing with the general agents, recognized their power to borrow money, and acquiesced in their action in so doing. At the time when the plant of the Hardy Shipbuilding Company was seized under a chattel mortgage, and the general agents by legal proceedings obtained the

possession thereof, the plaintiff in error was informed of the main facts in that matter, and was advised that such possession had been taken, and that its general agents had incurred heavy expense in the litigation, and were proceeding to complete the contracts. It did not disaffirm or disapprove the action of its general agents in so doing. It is true that the secretary of the plaintiff in error testified that the general agents had no power to borrow money for the company under any circumstances, and that no such authority had arisen by virtue of any custom of such agents to borrow money. It may be assumed to be true, as this testimony shows, that no express authority was ever given the agents to borrow money on behalf of their principal. But it is also true that they were never forbidden to borrow money, and that the plaintiff in error, through all its dealing with them, contemplated the contingency of its becoming a co-contractor on any or all of the contracts upon which it became surety, and that it looked to them to safeguard its interests in such a contingency. It is not to be supposed that in undertaking such contracts the plaintiff in error, distant as it was from the scene of the operations, contemplated giving its personal attention to the contracts. The whole course of its correspondence and actions shows that it expected its general agents to act for it in every case where it might become a co-contractor. The completion of such contracts which were in default involved, or might fairly be expected to involve, the advancement and expenditure of money. In the case of the contracts under consideration in the present case, it did involve the advancement of money. All through the correspondence the plaintiff in error was notified that its agents were advancing money and incurring expense. It must have known that the money was advanced upon its own responsibility, and not upon that of its agents. When its agents drew directly upon it for funds to carry out the contracts, it did not deny its liability for such funds, nor did it deny the authority of its agents to draw upon it. It refused to make the advance solely upon the ground that sufficient money appeared to be left to finish the Hardy contracts, and that arrangement ought to be made for advances from the owners. Two days after so telegraphing, it directed its agents to "prorate payment due among materialmen authorizing owners to pay them direct." After the plaintiff in error had been notified by a dispatch sent August 25th that the defendants in error had advanced money for material and labor, and that they insisted upon immediate payment, it wrote to its agents: "We will be pleased to have you forward a report showing just what portion of the work has been completed, together with the payments made," and still later it wrote them that, "in the meantime, it can do no harm to suspend work on the contracts for a week." Under all the evidence so adduced, we find no error in the ruling of the trial court in denying the motion of the plaintiff in error for an instructed verdict.

The judgment is affirmed.