THE STATE v. JAMES K. CHRISTOPHER, Appellant.—2 S. W. (2d) 621.

Division Two, December 2, 1927.

226

*Morrison, Nugent, Wylder & Berger* and *Morris Townley* for appellant.

*North T. Gentry,* Attorney-General, and *A. M. Meyer,* Special
Assistant Attorney-General, for respondent.

WHITE, J.—This case was appealed to this court, and transferred to the Kansas City Court of Appeals for want of jurisdiction in this court. The Court of Appeals thereafter certified the cause to this court on the ground that its opinion was in conflict with a ruling of the Springfield Court of Appeals in Hawkins v. Railroad, 202 S. W. 1060. We therefore have jurisdiction whether or not such conflict in fact appears. If the court rendering the opinion, or one of its judges, "shall deem" such conflict exists, the certification is authorized. [Art. VI, sec. 6, Amendment of 1884 to Constitution.]

A grand jury in the Circuit Court of Pettis County returned an indictment charging the defendant with violation of Section 3574, Revised Statutes 1919, in that he unlawfully kept an office or place in that county wherein he conducted, and permitted J. B. Sterlin and others to engage in the pretended buying and selling of agricultural products, etc., without any intention to deliver or receive the property as sold or bought.

The defendant filed a motion to quash the indictment. The motion was overruled. A motion to suppress evidence was overruled. A trial was had April 28, 1925, jury waived, the case submitted upon an agreed statement of facts, defendant found guilty, and his punishment assessed at a fine of one thousand dollars. He thereupon appealed.

The facts agreed upon with "such inferences as may properly be drawn therefrom" are as follows:

"1. That defendant is a member of the Board of Trade of Kansas City, Missouri, located at Kansas City, Jackson County, Missouri, and of the Chicago Board of Trade, located at Chicago, Cook County, Illinois. The term 'Board of Trade' or 'Exchange' it is agreed should be used interchangeably herein and will refer to the Board of Trade.

"2. That said boards of trade are contract markets within the meaning of the Federal Grain Futures Act (42 U. S. St. 998-1003, inc.); that said boards of trade and each of them were and are designated as contract markets by the Secretary of Agriculture of the United States of America prior to January 1, 1924; that said boards of trade and each of them are now and have been since January 1, 1924, and prior thereto operating its contract markets under the regulations of said Secretary of Agriculture, a copy of which said regulation is attached hereto and made a part hereof and marked 'Exhibit A.'

"3. That the defendant for several years last past and up to and including the present time, was continuously engaged in the business of buying and selling grain on commissions for various and numerous customers for future delivery. That defendant is a resident of Kansas City, Jackson County, Missouri, with his chief office and place of business in Kansas City. That defendant maintained an office in Sedalia, Pettis County, Missouri, through his agent, one Halley, who was in actual charge of such office or place of business in Sedalia. That defendant furnished the market quotations for his Sedalia office by telegraph from Kansas City and his employee, Halley, displayed the quotations on a blackboard in the office, which separately indicated the current prices of grain at Chicago and Kansas City. Such agent received orders for the purchase of grain, etc., to be executed for the customer on the Kansas City or Chicago Board of Trade, as the customer would direct. Such agent transmitted the orders to the defendant at his office in Kansas City for acceptance. That such orders as were transmitted by the said Halley would be either executed on the Kansas City Board of Trade, or wired to the Chicago office of the defendant for execution on the Chicago Board of Trade where the bulk of the Sedalia business was transacted. That after the execution of the trade wired by the Kansas City office the customer would be duly notified and within a few days receive confirmation of the trade in the regular course of mail from the defendant's Kansas City office. The defendant in carrying on his business at Sedalia rented a room, paid the rent therefor, owned all the furniture therein, had a broker's license and a license from the city of Sedalia to transact business in said city of Sedalia. In transmitting the orders from Sedalia to Kansas City said Halley would not, after the first order, transmit the name of the customer, but would designate the customer by a certain number used for the purpose of brevity in telegraphing, which was transmitted to the main office in Kansas City. That if the customer was buying or selling grain a cash deposit of from six to ten cents per bushel was required to be paid by each customer.

"That practically all the transactions were conducted on a margin, though where a customer had credit a margin in the first instance was not always required.

"That the large majority of persons dealing with the defendant at Sedalia were not engaged in the grain business and the transactions were for gain only, although some of the trades were in the nature of hedging against grain actually held by certain customers in elevators or against shipments.

"That with respect to practically all transactions in defendant's Sedalia office there was no actual physical delivery of grain, but the purchases of customers were offset by subsequent sales, or sales were offset by subsequent purchases under the clearing house rules

of the Board of Trade, which are in evidence. At the time the original transactions were made by the customers, the customers intended in practically all cases to take or make no actual physical deliveries of grain, but in lieu thereof to settle by offset as aforesaid, and from the regular course of business in defendant's office the defendant had reason to believe that such was their intent. In case grain was bought and the market had advanced, when the transaction was closed or set off, defendant would remit his check for the amount of the difference between the buying and selling price in these transactions, less commission, etc., charged for handling the order. In the case the market declines the customer would remit his check to the defendant for the amount of the difference between the buying and selling price in the transactions, plus the commission, etc., charged for handling the order.

"A purchase for future delivery would be as follows: A contract made in March for the purchase of 5,000 bushels of July wheat was a contract whereby the purchaser agreed to take, and the seller agreed to deliver, 5,000 bushels of wheat during the month of July following. The rules of all of the boards of trade provided that the seller could deliver the wheat on any business day of the month of July, he was obligated, however, to make delivery during July, and the purchaser was obligated to accept delivery. A sale for future delivery would be the converse. All orders received at Sedalia were actually executed by defendant upon the exchange, subject to the rules of such exchange.

"In every case where defendant made a purchase or sale for one of his customers, he promptly thereafter delivered to the customer from his office in Kansas City, Missouri, a confirmation of such purchase or sale. The form of such confirmation was as follows:

" 'Established 1878
" 'B. C. Christopher & Co.,
" 'Grain Commission Merchants·

                        No..............b
" 'To............                 Kansas City, Mo...........
                      Bought
" 'We have this day             for your account
                    Sold

" 'All transactions made by us for your account contemplate the actual receipt and delivery of the property and payment therefor. We reserve the right to close these transactions when the deposits are running out, without giving further notice. We also reserve the privilege of clearing all transactions through Clearing Associations, if there be any, from day to day in accordance with the usage, rules or regulations of the Exchange where the trade is made; prevailing at the time. All purchases and sales made by us for you

are made in accordance with and subject to the rules, regulations and customs of the Chamber of Commerce or Board of Trade where the trades are made, and the rules, regulations and requirements of its board of directors, and all amendments that may be made thereto. This contract is made under authority of the Act of Congress known as the "Futures Trading Act."

"'Quantity Delivery  Article  Price  Bought of or  Address
Sold to

. . . . . .  . . . . . .  . .  . . . .  . .  . . . . . .  . . . . . . . .

"'We do not consider orders open from one day to next, unless by special instructions.

B. C. CHRISTOPHER & Co.
"'E. & O. E.  By . . . . . . . . .'

"All transactions made by defendant upon behalf of his customers were properly stamped under Section 9199, R. S. 1919, of Missouri. All transactions of the character above described were made by defendant on an exchange designated as a contract market, and all such transactions were evidenced by a record in writing as required by Section 4-b of the Grain Futures Act. That all such contracts were made by, through and with a member of the board of trade which had been designated by the Secretary of Agriculture as a contract market as provided by the Grain Futures Act, and that all such contracts were evidenced by a record in writing which showed the date, parties to such contract, and their addresses, the property covered and its price and terms of delivery, all of which was in accordance with the provision of Section 4-b of the Grain Futures Act.

"There is attached hereto and made a part hereof, Exhibits B and C, copies of the rules of the Board of Trade of Chicago, Illinois, and the rules of the Board of Trade of Kansas City, Missouri.

"4. Defendant does a large business in the handling upon commission of car-load lots of grain and other commodities; buying and selling the same as agent for his customers, and in the year 1924 so handled and delivered for his customers 5726 car loads of wheat and other grains, a large portion of which was handled in interstate commerce.

"5. That the business of defendant was organized in 1878 and has been continuously operated since that time and there has never been any prosecution instituted against defendant on account of his business prior to the institution of this cause of action; that since the passage and operation of the Grain Futures Act, there has never been any complaint against defendant upon the part of the Secretary of Agriculture or his employees who are in charge of the administration of the said Grain Futures Act.

"6. It is agreed that the defendant is contending that the business conducted by him is under the control and regulations of the

Federal Government and subject to the laws of the United States solely; and that the interference with the business conducted by defendant is an undue burden on and an interference with interstate commerce; and that by submitting this controversy upon the foregoing facts, the defendant does not waive the question of the jurisdiction of the courts of Missouri herein, nor does defendant waive any constitutional inhibition herein; that Section 3574 of the Revised Statutes of Missouri, 1919, has been superseded by the 'Grain Futures Act' of the United States and for that reason Section 3574 of the Revised Statutes of Missouri of 1919 is unconstitutional, inoperative and ineffective as far as the business of this defendant is concerned.

> "Roy W. Rucker,
> "Prosecuting Attorney.
> "H. B. Shain,
> "W. D. O'Bannon,
> "Brown Harris,
> "Attorneys for Defendant."

Attached to the agreed statement are: Exhibit A, general rules and regulations of the Department of Agriculture; Exhibit B, rules and regulations of the Kansas City Board of Trade; Exhibit C, rules and regulations of the Chicago Board of Trade. These were admitted in evidence over the objection of the State.

The general rules and regulations referred to as Exhibit A, were prescribed by the Grain Futures Act. Section 1 of those rules provides that they should apply and be in force only in accordance with and subject to the provisions of the act, and shall not prevent the legitimate enforcement or application of any valid law, rule, regulation or requirement of any contract market which is not inconsistent or in conflict with the act and these rules and regulations.

Section 2 provides for the making by each contract market of reports to the Grain Futures Administration, and of the keeping of records by each contract market and for the delivery each month of reports containing certain facts in relation to the business transacted, which need not be further explained for our purpose here.

Section 3 provides for keeping records in respect to transactions of future delivery and cash transactions in chronological order, and exhibits of such order when requested by the Department of Agriculture.

Section 4 forbids the Department of Agriculture without the consent of the members of a board of trade, to divulge, except on certain conditions, any facts regarding the business of the contract market.

Sections 4, 5, 6 and 7, further regulate the conduct of the business and the manner of making and furnishing reports.

Section 8 defines certain terms used in the rules.

Exhibit B, referred to in the stipulation, contains the rules and regulations of the Kansas City Board of Trade.

Section 3 of those rules provides *that no member of the Association is allowed to be both principal and agent in any transaction or allow himself directly or indirectly to be placed in the position of agent for both seller and buyer.*

Section 4 provides that any person claiming to act as a broker during any session of the Board of Trade shall be required to name his principal.

Section 5 is as follows:

"Sec. 5. (Only actual trades allowed) *Only actual trades shall be allowed to be made on the Board of Trade,* and no arrangement for the purchase or sale of commodities shall be entered into *except where it is intended there shall be an actual receipt or delivery of the property so bought or sold;* and any member entering into any arrangement in which it is understood that there shall be no actual receipt or delivery, but that only the difference shall be settled between the parties, or reporting any false or fictitious sales, making any such sales, giving out any fictitious reports concerning the state of the market, or otherwise violating the provisions of this section, *shall, upon conviction, be expelled by the Board of Directors.*"

Section 15 contains the following:

"Section 15. (Bucket-shop, trading in or with prohibited) *Any member of the Association who shall be interested or associated in business with,* or who shall act as the representative of, or shall knowingly directly or indirectly, *buy or sell any cash grain or execute* any order or orders for the account of any organization, firm or individual *dealing in any manner in differences on the fluctuations in the market price* of any commodity or corporate stock *without a bona-fide purchase and sale of the article for an actual* delivery; or who shall be a member of, or shall in his own behalf, or as agent, directly or indirectly make, execute or give any orders for a trade or transaction in *or upon any bucket-shop or any so-called exchange, wherein is conducted or permitted the business aforesaid,* or who shall knowingly accept, either directly or indirectly, from any member of any so-called exchange, wherein is conducted or permitted the business aforesaid, any orders for trades or transactions to be executed in the Exchange Hall of this Association, *shall be deemed guilty of unmerchantile conduct;* and upon complaint to and conviction thereof by the Board of Directors *he shall be suspended or expelled from membership in* the Association, as the Board of Directors may decide."

Other provisions follow relating to warehouses and regulating the conduct of trading.

236

The statute, Section 3574, Revised Statutes 1919, under which defendant was convicted, is as follows:

"Sec. 3574. *Keeping places for, forbidden,—punishment for.*— It shall be unlawful for any corporation, association, copartnership or person to keep or cause to be kept in this State, any office, store or other place wherein is conducted or permitted the pretended buying or selling of the shares of stocks or bonds of any corporation, or petroleum, provisions, cotton, grain or agricultural products whatever, either on margins or otherwise, without any intention of receiving and paying for the property so bought, or of delivering the property so sold, or wherein is conducted or permitted the pretended buying or selling of such property on margins, when the party selling the same, or offering to sell the same, does not intend to have the full amount of property on hand or under his control to deliver upon such sale, or when the party buying any of such property, or offering to buy the same, does not intend actually to receive the same if purchased, or to deliver the same if sold; and the keeping of all such places is hereby prohibited; and any person, company, copartnership or corporation, or officer or agent thereof, that shall be guilty of violating this section, shall, upon conviction thereof, be fined in a sum not less than five hundred dollars nor more than five thousand dollars."

The defense presented is that, by the Grain Futures Act, Congress assumed entire control of such transactions as that complained of in this case, covered by the Missouri statute, and therefore supplanted that statute. The argument, in effect, runs this way: If the Grain Futures Act forbids the act charged against the defendant and covered by the Missouri act, then the Missouri act is rendered nugatory and the Federal act controls; if the Grain Futures Act does not forbid the transaction which the defendant permitted in his "place" at Sedalia, then it is made lawful by the Grain Futures Act and the State has no authority to declare unlawful what Congress has determined to be lawful. That is, Congress took over the regulation of all future trading in grain whether it affects interstate commerce or not.

Two principal questions arise:

*First*: Does the Grain Futures Act annul the Missouri statute, Section 3574, or does it only restrict the operation of that statute to places other than "contract markets," designated by the Secretary of Agriculture? That is, does it merely take contract markets from under State control?

*Second*: Regardless of conflicting provisions, if any, between the State statute and that of Congress, does the offense of which defendant was found guilty come within the terms of the Grain Futures Act?

I. Section 3574, Revised Statutes 1919, makes it a misdemeanor for any person to keep an office, store or other place where is permitted pretended buying and selling of stocks, grain and other products without any intention of receiving and paying for the property so bought, or delivering the property so sold.

The indictment charges in proper terms a violation of that statute. It is not contended by the defendant that the conduct which brought about his conviction does not come within the terms of the Missouri statute, and it is not denied that therefore he did keep an office or place of business in Sedalia where such buying and selling were permitted.

Besides, that matter was determined by this court in construing this statute in State v. Kentner, 178 Mo. 487,—a case exactly like the present one. There the defendant was charged with the violation of the statute and was convicted. He kept a place in Mound City, Holt County, where market quotations were displayed on a blackboard, and orders for purchase or sale of grain, stocks, etc., were given to defendant's agent who telephoned them to defendant's office in St. Joseph. It was held that the pretended buying and selling took place at Mound City and not at St. Joseph.

As the stipulation goes, the defendant's agent at Sedalia received an order from a customer (purchaser), who paid his margin. This order was wired to Kansas City and within a few days the customer would receive a "confirmation of the trade" by mail from the Kansas City office. If that means anything it means the trade was already made so far as the customer was concerned. Besides, defendant had a license from the city of Sedalia to operate his "place" there.

We take it, therefore, that the customers of the defendant bought in the manner described, in Sedalia, in violation of the statute; that actual buying and selling which he permitted and conducted did not take place on the Board of Trade of Kansas City or that of Chicago. That may have an important bearing as we examine the facts.

It must be borne in mind that the Missouri statute does not forbid, nor does the indictment charge, the making or negotiation of sales or contracts, illegal or otherwise. Defendant is charged with keeping a *place* where he permits gambling in futures—pretended sales. If the so-called contracts were not made in Sedalia at his place, then he is not guilty. He does not deny that they were made there, contrary to the statute.

II. An examination of the stipulation will reinforce the conclusion reached in Paragraph I.

The stipulation says that all transactions described "were made by defendant on an exchange designated as a contract market." That

238

is a mere conclusion of the stipulators and we are not bound by their interpretation of the agreed facts. It is followed by a statement that the transactions were evidenced by a record in writing, as required by Section 4, Exception (b), of the Grain Futures Act; that the record showed the· date, the parties to such contracts, their addresses, etc., that all such contracts were made through and with a member of a board of trade which had been designated by the Secretary of Agriculture as a contract market.

A record may have been made of such transaction that occurred in the city of Sedalia and filed with the "contract market" at Kansas City, under the rules, yet that would not show that the transactions evidenced by the record took place in Kansas City. *Such transactions were not included in the reports made, as required by the rules of· the Secretary of Agriculture, to· Grain Futures Administration.* If they had been the fact must have been noted in the stipulation.

Further, Section 5 of the Kansas City Board of Trade regulation provides that:

"Only actual trades shall be allowed to be made on the Board of Trade, and no arrangement for the purchase or sale of commodities shall be entered into except where it is intended and there shall be an actual receipt or delivery of the property so bought or sold."

Section 3 of those regulations says:

"No member of this Board or Association is allowed under any circumstances to be both principal and agent in any transaction."

And,

"No member . . . shall allow himself directly or indirectly, either by his own act or the act of an employee  .  .  .  to be placed in the position of agent for both seller and buyer."

These sections are followed by other rules of great length and elaboration, dealing with the reception, delivery and storage of grain, warehouses and the like, showing that members of that Board of Trade were not allowed to represent any person dealing in grain unless actual delivery was contemplated. If a member violated those rules quoted he was liable to expulsion.

The written "confirmation" of a contract provides that "all transactions made by us for your account contemplate the actual receipt and delivery of the property and payment therefor." It further recites that all purchases and sales are made in accordance with the rules and subject to the regulations of the Board of Trade "where the trade were made." These recitals of fact in the *"contract"* are not binding upon us if contrary to the facts stated in the stipulation.

Now consider the stipulation, which says: "There was no actual physical delivery of grain."

And this:

"At the time the original transactions were made by the customers, *the customers intended in practically all cases to take or make no actual physical deliveries of grain, but in lieu thereof to settle by offset as aforesaid and from the regular course of business in defendant's office, the defendant had reason to believe that such was their intent.* In case grain was bought and the market had advanced, when the transaction was closed or set off, *defendant* would remit his check for the amount of the difference between the buying and selling price in these transactions, less commission, etc., charged for handling the order. In the case the market declines the *customer* would remit his check to the *defendant* for the amount of the difference between the buying and selling price in the transactions, plus the commission, etc., charged for handling the order.'"

Here is a statement, not merely that the customers had no intention regarding actual delivery, but affirmatively, that at the time they gave the orders, they intended *not* to make delivery. These customers understood, at the time they put up their margins, that the recital in the contract about actual delivery was not to be observed, and that the rules of the Kansas City Board of Trade, if they knew anything about them, were to be disregarded. Contracts are construed as they are understood and acted upon by the parties to them.

Then the contract contains this stipulation which the customers and the defendant *did* regard as binding, for they acted upon it:

"We reserve the right to close these transactions when the deposits are running out without giving further notice."

"We" means Christopher & Company. How does this comport with the rules of the Kansas City Board of Trade which forbids a member to be placed in the position of agent of both buyer and seller? Or to be both principal and agent in any transaction?

The stipulation says, and the form of the confirmation shows, that the purchaser and seller were named, but the contract was not signed by anybody but B. C. Christopher & Company. They reserve the right to close out the contract when the customer's margin is exhausted. If the price of wheat goes up the purchaser is safe because he can sell his purchase for more than it cost him. If it goes down and he fails to put up any additional margin he forfeits what he puts up because wheat is selling cheaper than his contract price. In the former case the *defendant* would remit his check for the difference between the buying and selling price, less commission. In the latter case the customer would remit his check to the *defendant* for the difference, plus the commission. Put those transactions with the statements that there is an intention not to deliver, and that Christopher & Company may close out in case the margin is exhausted, without notice to either party. Now could this be done unless Christopher & Company was agent for both parties? or both

agent and principal, contrary to the Kansas City rules? These transactions could not, then, have taken place on the Board of Trade in Kansas City. Defendant had to go to a remote point not controlled by the Grain Futures Act in order to engage in them.

The stipulation does not explain how transactions in grain were conducted on the Board of Trade at Kansas City, so we cannot compare the real sales between real parties which were negotiated there, with the transaction in Sedalia. But defendant's counsel essays an explanation which resembles the "ring settlement," described by Justice HOLMES in Board of Trade v. Christie Grain & Stock Co., 198 U. S. 1. c. 247: "If A has sold to B five thousand bushels of May wheat, and B has sold the same amount to C, and C to D, and D to A: substituting D for B by novation, A's sale can be set against his purchase, on simply paying the difference in price."

The same Judge in the same case defined bucket-shops (1. c. 246): "Places wherein is permitted the pretended buying and selling of grain, etc., without any intention of receiving and paying for the property so bought, or of delivering the property so sold."

In the former there are real parties to a bona-fide contract of sale. In the latter the intention and the nonperformance nullify the *form* of the transaction.

In Sedalia the blackboard did not disclose an offer by A to sell so much July wheat at such a price. It merely displayed the selling price of July wheat in Kansas City. The "customer" took five thousand bushels and paid his margin. So far as the customer was concerned his trade was made. He so understood it. If it were a bona-fide purchase he would want to know who he was dealing with. He would inquire who was the seller and what was his responsibility and ability to comply with his contract, or pay the loss occasioned by failure to comply. As a matter of fact he does not care who is named as the seller. He puts up his money on the theory that he will lose it if grain declines, and he will make a profit if grain advances. He simply makes a bet which is registered by the defendant.

If there were a bona-fide contract between the buyer and the seller, as the names are stated in the confirmation of the contract, the defendant, having negotiated the trade, would have no authority "to close the transaction;" only the parties could do that, according to the terms of the contract.

The significance of that authority must not be overlooked. He could "close the transaction" with the purchaser, not merely pass it on to the next purchaser. The contract which the purchaser undertook when he bought goes out of the picture when his margin was exhausted. Nobody remained who was under any obligation to perform.

Suppose the nominal seller, the other supposed party to the contract, does not want to close out. He is not in default; no further margin is required of him and he wants to remain in the game. How can the broker who has negotiated a real contract of sale between two real parties close out one without the consent of the other, or without providing a substitute performer? The stipulation does not pretend to explain how ring transactions, offset settlements and the like, can be bona-fide effected by that method of "closing."

By the stipulation, any inference which properly could be drawn from the facts, might be drawn by the trial court. We must assume that the court found every fact supported by evidence necessary to support the judgment. [Smith v. Railroad, 279 Mo. 187.]

The practice in Sedalia, in utter violation of the Kansas City rules, the agreed intention not to deliver, the authority to Christopher & Company to forfeit the margin and close out the transaction when the price went down, without notice to anybody, the payment of profits by the defendant, and the settlement of losses with him, with no intimation that such profits or losses were passed on to the *other party named in the contract or his assigns*, justified the finding that the form given to the transaction was merely colorable, intended to give a semblance of legality to an illegal act; that by a "gentlemen's agreement" the stipulation about actual deliveries and payment was to be ignored; that the two parties to the contract named in the "confirmation" were not to function as such; that in fact the only parties to the transaction were the "customer" and the defendant; that the customer had no intention to buy grain, or to make a binding contract to buy it; he intended that his contract should not produce, in the end, a delivery of grain to him or to anybody to whom he might sell. He placed his bet that grain would advance. If he lost, his margin would be applied by the defendant to settle with some winner who happened at the proper time to sell out. Just how the so-called sales balanced with so-called purchases, if they always did, we are not informed, but we may infer that the practice and results in Sedalia were not unlike race-track pooling, as commonly understood.

The defendant had never been prosecuted, so the stipulation says, on account of his transactions (we presume by the Board of Trade of which he was a member), and the Secretary of Agriculture had not complained of him. If there had been such prosecutions and complaints he could have shown that the transactions took place in Sedalia where there was no "contract market" which the board would control, and where the Grain Futures Act did not apply.

The New York Court of Appeals, in Hurd v. Taylor, 181 N. Y. 231, thus characterized a transaction such as we have under consideration here, where (l. c. 233) it was said: "If the intention is that

the so-called broker shall pay his customer the difference between the market price at which the stocks were ordered purchased and that at which they were ordered sold, in case such fluctuation is in favor of. the customer, or that in case it is against the customer, the customer shall pay the broker that difference, no purchases or sales being made, the transaction is a wager and, therefore, illegal.''

By all the definitions of ''bucket-shop'' the place maintained by the defendant in Sedalia was a bucket-shop.

III. Do the transactions permitted by defendant come under the control of the Grain Futures Act, enacted by Congress in 1922, which resembles the Future Trading Act, previously enacted? The validity of the Future Trading Act came before the Supreme Court and it was held unconstitutional. [Hill v. Wallace, 259 U. S. 44.] The Grain Futures Act came before the same court in Chicago Board of Trade v. Olsen, 262 U. S. 1, and was held constitutional. Chief Justice TAFT wrote the opinion in each of those cases. Both of those acts sought to regulate and prevent abuses in grain speculation in the great marts of trade. The provisions of both are essentially the same, except that the Grain Futures Act *purports* to deal with transactions which affect interstate commerce, and contains a legislative finding of fact that the transactions regulated do injuriously affect interstate commerce. Those features were absent from the Future Trading Act. It was because of this purpose of the act, and the ascertained effects of the transactions treated, that the latter act was held constitutional. Hill v. Wallace was a proceeding whereby certain members of the Board of Trade of Chicago sought to enjoin the enforcement of that part of the Future Trading Act which imposed a tax of twenty cents a bushel on contracts for the sale of grain for future delivery, excepting those sales made on Boards of Trade designated by the Secretary of Agriculture. The act also provided certain regulations in relation to grain markets, similar to those in the Grain Futures Act. Judge TAFT in declaring the act unconstitutional thus comments on its effect, 259 U. S. 1. c. 67-68:

''Grant the validity of this law, and all that Congress would need to do, hereafter, in seeking to take over to its control any one of the great number of subjects of public interest, jurisdiction of which the States have never parted with, and which are reserved to them by the Tenth Amendment, would be to enact a detailed measure of complete regulation of the subject and enforce it by a so-called tax upon departures from it. To give such magic to the word 'tax' would be to break down all constitutional limitation of the powers of Congress and completely wipe out the sovereignty of the States.''

The opinion continues (p. 69):

"It follows that sales for future delivery on the Board of Trade are not in and of themselves interstate commerce. They cannot come within the regulatory power of Congress as such, unless they are regarded by Congress, *from the evidence before it,* as directly interfering with interstate commerce so as to be an obstruction or burden thereon."

Amplification cannot add to the force of that statement.

When Congress took up the subject after the ruling in Hill v. Wallace, it proceeded with caution in framing the Grain Futures Act, as it traced the course it might travel while skirting the edge of the territory, police power, reserved to the States. In that region it might not intrude, though it might bridge some of the depressions in it, while maintaining its approaches and abutments on the solid ground of Interstate Commerce. In its previous venture, the structure which it had projected collapsed for lack of just that foundation.

The opinion in the Olsen case, 262 U. S. 1, pointed out the evils which the Grain Futures Act was designed to alleviate. It purported only to regulate interstate commerce and sales of grain for future deliveries "because . . . they have become a constantly recurring burden and obstruction to that commerce" (l. c. 32).

"Prices of grain in dealing in futures are susceptible to speculation, manipulation and control which are detrimental to the producer and consumer and persons handling grain in interstate commerce and render regulation imperative for the protection of such commerce and the national public interest therein." (Id. 37.)

Congress, recognizing the evils of speculation and gambling in grain futures, no doubt if it had had the power, would have enacted a law regulating all such trading without restrictions as to time, place or circumstances. Appellant argues that it did just that thing, in order to make the act compass the offense complained of here. But we think it did nothing of the kind. It carefully, studiously, chose the ground where the disturbance of interstate commerce was *proved,* and where its action might prevent that disturbance. There was no general regulation or attempted regulation of the trade which might affect interstate commerce. Specific features incidental to future trading are carefully selected and enumerated.

From the evidence before Congress it might very well have found that such trading tended to corrupt the morals of those who were tempted to engage in it and tended injuriously to affect the welfare of the community where it was permitted; but with those effects Congress had no concern. Let us see just what the Grain Futures Act does cover.

Sections 2 and 3 define the terms used, explain the purpose of the act, and justify it by a legislative determination of facts.

Section 4 of the act contains the following: ·

"Sec. 4. It shall be unlawful for any person to *deliver for transmission through the mails or in interstate commerce by telegraph, telephone, wireless, or other means of communication any offer to make or execute, or any confirmation of the execution of,* or any quotation or report of the price of, any *contract of sale of grain for future delivery* on or subject to the rules of any board of trade in the United States, or for any person to make or execute such contract of sale, which *is or may be used for* (a) hedging *any transaction in interstate commerce* in grain or the products or by-products thereof, or (b) de-· termining the *price basis of any such transaction in interstate commerce,* or (c) delivering grain sold, shipped, or received in interstate commerce for the fulfillment thereof, except—" then follow exceptions (a) and (b). [42 U. S. Stat. at Large, p. 998.]

Thus it is unlawful for anyone to negotiate "through the mails" or in interstate commerce by some interstate agency, a contract of sale of grain for future delivery, where such sale may be used for "hedging any transaction in interstate commerce." Or, "determining the price basis of any transaction in interstate commerce." Or, "delivering grain sold, shipped or received in interstate commerce."

No buying or selling is forbidden in that act unless the negotiation is conducted through the United States mail or *is in fact interstate commerce* conducted through some interstate agency. A and B might meet on the street and engage in that business; A might sell and B might buy wheat to be delivered at a future time, without any intention of delivering. This act does not forbid it. A might go to the defendant's agent in Sedalia and offer to purchase wheat and the offer might be transmitted to Kansas City by telegraph (which it is claimed was done in this case), and the deal there consummated with the other party. It would neither be forbidden nor authorized by this act. Such a deal might be negotiated by mail by a man in Missouri with a man in Chicago, unless the deal were in fact interstate commerce, and had the effect mentioned in Section 4, it would not come within the terms of the act, forbidden or authorized.

Exception (a) provides for the ownership or control of the grain sold, and exception (b) is where the contract is made through a member of the board of trade which has been designated by the Secretary of Agriculture as a "contract market" under certain conditions. These exceptions do not enlarge the compass of the specifications in Section 4. They simply state conditions under which the transmission of the offers, negotiations, quotations, etc., forbidden in Section 4, may be lawful. The act forbids certain transactions; the exceptions remove from the operation of that prohibition such transactions under certain conditions. How can the exceptions include more than the act? The construction assumed by defendant has just that ef·

fect; makes the part greater than the whole. Thus the tail not only wags the dog, but swallows him.

It must be noted that the negotiations forbidden by Section 4 do not necessarily of themselves constitute deals in interstate commerce. [Ware & Leland v. Mobile County, 209 U. S. 405.] The Supreme Court in that case thus characterized such transactions (l. c. 411): They "are not the subjects of interstate commerce, simply because they are negotiated between citizens of different states, or by the agent of a company in another State, where the contract itself is to be completed and carried out wholly within the borders of a State although such contracts incidentally affect interstate trade."

The transactions permitted at defendant's place, described in the stipulation, have nothing to do with interstate commerce. Nothing is said about the shipment across the state line of any grain, the subject of the so-called purchases. The only feature of any of those transactions which comes within the control of Congress is the "confirmation" of a purchase sent "by mail" from Kansas City to Sedalia. It may be argued that such confirmations *by mail* are forbidden by the act. But the Missouri statute does not declare such a confirmation unlawful, nor attempt to deal with it at all. The statute forbids the keeping of a place where deals, thus later confirmed, were entered into in the first place. A state law may prohibit the printing and sale of obscene literature. That does not interfere or conflict with the act of Congress forbidding the transmission of such literature through the mails. The production of the objectionable matter is one act, of which the State has control. The transportation through the mails is another act under the jurisdiction of Congress. So here, the bogus sale of grain at Sedalia is not forbidden by the act, which could apply only to the confirmation of it by mail. Such confirmation by messenger or by telephone or telegraph could not be covered by the act.

Section 5 of the act authorizes and directs the Secretary of Agriculture to designate any Board of Trade as a "contract market," upon certain conditions, such as location at terminal market, when the volume of business reflects general conditions; with provision for reports, records, preventing abuses, manipulations of market, membership, etc.

Sections 6, 7 and 8, provide for applications for designation of contract markets, revocations, and suspension of contract markets, review by the courts, expulsion of members of a board of trade, the vacation of designations as contract markets, and investigations by the Secretary of Agriculture of the operations of boards of trade.

Section 9 affixes penalty for violation of Section 4.

Subsequent Sections 10, 11 and 12 contain other regulatory measures for enforcing the act.

The United States Supreme Court, so far as we are informed, has not construed the act so as to define its compass. When it does, it seems to us it must hold that no part of the act enlarges the field of its operations beyond the specific transaction mentioned in Section 4, that all the regulations and provisions following that section concern only negotiations conducted in the manner there stated.

But suppose boards of trade designated as contract markets do not prevent its members from engaging in transactions which are not negotiated in the manner mentioned in Section 4. Is such permission a violation of the act? Or, if not, were such transactions in contemplation of Congress, and are they controlled by the act? Is it possible that no sale for future deliveries by a member of a board of trade designated as a contract market, no matter what the terms or *where conducted* could. ever take place without coming within the terms of the act, even though it might be a strictly intrastate trade and have no effect whatever on interstate commerce? If so, then the act must be stretched by intendment from its general purpose, for such conclusion cannot be gathered from its terms, express or implied.

Further, in order to sustain the position of defendant we must hold that whatever trading the act has not forbidden it has made lawful, whether such trading occurs on a contract market or elsewhere, whether it affects interstate commerce or not. For counsel present this bald argument:

"In effect, the Missouri statute prohibits future trading as it is now carried on pursuant to the authorization of the Secretary of Agriculture. This presents the question whether Missouri may prohibit what the Secretary of Agriculture may authorize."

That is, Missouri cannot prevent grain gambling in Sedalia because the Secretary of Agriculture has designated a place in Kansas City where it is forbidden. Missouri is powerless to prevent bucket shop gambling anywhere within its borders, and that kind of trading, everywhere recognized as evil in its effects, can flourish unmolested over the State because Congress regulates it in Kansas City and has not seen fit to forbid it elsewhere.

Exception (b) to Section 4 of the act does not require the dealings controlled to be made on a contract market, but they must be made by a "member" of a board of trade there. Defendant seems to assume that the act thus contemplates control of such members wherever they deal. But the member must act under the rules and regulations promulgated by the Secretary of Agriculture. Those rules and regulations apply only to contract markets. They contemplate control of those markets and their members in trading done there, not elsewhere. Therefore, the act does not regulate, forbid nor make lawful any contract for future deliveries unless the contract is made on a contract market.

True, the rules of the Kansas City Board of Trade provide for expulsion of a member who is guilty of the acts charged to defendant. But Section 4 does not forbid it, and Section 9 does not provide punishment for such acts. The Kansas City Board of Trade can very well make rules for its members, and discipline them for violations, which are entirely outside the scope of the act. That is, it could extend control of members beyond the requirements of the law.

We think the purpose of Congress and the effect of the act was not to destroy the police power of the State in such matters, nor to annul the Missouri statute, but to restrict its operations. We accordingly hold, until Federal authority declares otherwise, that the effect of the Grain Futures Act was to restrict the operation of State laws, like our Section 3574, so as to make them inapplicable to transactions coming within the terms of the Grain Futures Act, conducted on a "contract market" according to the rules prescribed by that market.

IV. The authority of the State under its police power to enact and enforce regulations which it deems necessary for the welfare of its citizens, even though such regulations incidentally affect interstate commerce, unless direct specific legislation of Congress covers the exact subject, is recognized by the United States Supreme Court. [Mo. Pac. Ry. Co. v. Larabee Mills, 211 U. S. l. c. 623; Southern Ry. Co. v. Reid, 222 U. S. 437; M. K. & T. Ry. Co. v. Harris, 234 U. S. l. c. 417.] Such as punishment by a State for forgery of a promissory note payable to a national bank. [Cross v. North Carolina, 132 U. S. l. c. 139.]

The transactions here occurred in Sedalia, which was not a designated contract market. It was not a place permitted by the Grain Futures Act. Nor was it a place forbidden by that act. The conduct of such a place was not covered by any of the terms of the act. It was wholly within the jurisdiction of the State to prevent the maintenance of such a place.

The gradual but certain encroachment of the Federal Government upon the authority of the States is not always the result of intention, but is to some extent due to the inexorable drag of events. The circumstances of our complex social structure drive us to it. Yet, the feverish demands for Federal regulation, arising, like the clamors for more State regulation, from the prevailing notion that all human ills can be cured by legislative enactments, no doubt, often move Congress to action by plausible counterfeits of necessity. With that in view, Congressional intention should not be spread by construction over ground where its expressed limits do not reach.

Defendant even claims, as the stipulation shows, that the interference with his business by enforcing the Missouri statute is "an un-

due burden and interference with interstate commerce." Yet, Congress determined that such transactions were a burden upon interstate commerce, where they affected it at all. To stop them would be to promote and protect interstate commerce. The question is, "Has Congress taken to itself the regulation of all such dealings, or only such as it found to be necessary at certain controlling markets and affecting limited features of interstate commerce. Has it come to. the point that a State cannot stop gambling in futures at small towns and cross-road hamlets, because Congress has seen fit to regulate it at great terminal points? That everything Congress has not forbidden or regulated, it has made lawful by failing to say anything about it? The opinion in the Olsen case, supra, (1. c. 40), elucidates the general power of Congress over the subject.

It may be said that, according to the stipulation, *some* real sales and purchases of grain were negotiated in the Sedalia office. That is beside the question. The point is that defendant kept a place there, where bucket-shop gambling was permitted.

The judgment is affirmed. All concur.