## LYONS MILLING CO. v. GOFFE & CARKENER, Inc.

No. 287.

Circuit Court of Appeals, Tenth Circuit.

Jan. 2, 1931.

Rehearing Denied Feb. 12, 1931.

Roy B. Thomson, of Kansas City, Mo. (I. P. Ryland and Arthur Mag, both of Kansas City, Mo., on the brief), for appellant.

Justin D. Bowersock, of Kansas City, Mo. (Bowersock, Fizzell & Rhodes, of Kansas City, Mo., on the brief), for appellee.

Before LEWIS and PHILLIPS, Circuit Judges, and POLLOCK, District Judge.

PHILLIPS, Circuit Judge.

Goffe & Carkener, Inc., hereinafter called plaintiff, is a Missouri corporation engaged in business as a grain broker at Kansas City, Missouri. The Lyons Milling Company, hereinafter called defendant, is a Kansas corporation engaged in the manufacture of flour at Lyons, Kansas.

Plaintiff brought this action against defendant for money alleged to be due on account of purchases and sales of wheat and corn on the Boards of Trade at Kansas City, Missouri, and Chicago, Illinois, made by plaintiff, as broker for defendant, in the name of M. B. McNair.

The bill alleged that the account involved many transactions, that it was complicated and complex, and that plaintiff had no adequate remedy at law. The bill prayed for an accounting in equity.

Defendant filed a motion to dismiss the bill for want of equity. The trial court overruled this motion without prejudice to the right of defendant to move to transfer the cause to the law docket.

Thereupon, defendant filed an answer in which it alleged that, for the purpose of offsetting contracts for the sale of flour to be ground by its mill, it purchased, through plaintiff as broker, in November, 1924, 85,000 bushels of wheat for future delivery; that on February 4, 1925, defendant sold, through plaintiff as broker, 30,000 bushels of such wheat; that plaintiff wrongfully sold the remaining 55,000 bushels of such wheat on April 4, 1925; that the balance of the trades, set up in such account, were made by McNair for his personal account, and that plaintiff was charged with knowledge of such fact; that the only authority granted McNair by defendant was contained in a resolution adopted by its board of directors on June 15, 1922; that plaintiff was a member and defendant a non-member of the Board of Trade of Kansas City; that plaintiff failed to comply with the rule of such Board of Trade adopted May 2, 1922, and effective June 1, 1922; and that no actual delivery of grain was made or was intended to be made under the contracts for purchases and sales set out in such account.

The answer also set up a counter-claim against plaintiff based upon the alleged wrongful sale of such 55,000 bushels of wheat.

When the case came on for trial, defendant, through its counsel, admitted the correctness of plaintiff's account and requested the court to try the cause.

On May 2, 1922, the Board of Trade of Kansas City adopted the following rule:

"Any member, firm or corporation accepting orders for the purchase or sale of any of the commodities dealt in under the rules of this Association for future delivery, from a non-member corporation, shall obtain in advance from such non-member corporation a written authorization to the effect that the manager or officer of said corporation giving such order, or orders, is duly authorized by his corporation to buy or sell such commodities for future delivery under the rules and regulations of this Association for the account of his corporation, and the name shall be entered upon the books of the aforesaid member, firm or corporation accepting the same in the name of the corporation for which the order or orders were made; in addition to the regular confirmation prescribed by the rules, written notice of each transaction shall be mailed to some executive officer of the said corporation, other than the manager or officer giving the order. A violation of any of the provisions of this paragraph shall be punishable by suspension for such period as the Board of Directors in its discretion may determine; provided, however, that in the opening of new accounts a reasonable time for the securing of such authorization for the first order may be allowed. This amendment to be effective on and after June 1, 1922."

On June 15, 1922, defendant adopted the following resolution:

"Resolved.—That M. B. McNair, as manager of this corporation, be hereby authorized to make and execute orders and contracts

for the purchase or sale of any of the commodities dealt in under the rules of the board of trade of Kansas City, Missouri, for future delivery for the account of this corporation and that the Secretary of this corporation certify and transmit a copy of this resolution, together with a list of the executive officers of this corporation to all members of the board of trade of Kansas City, Missouri, which this corporation shall now or hereafter place orders for the purchase or sale of any of said commodities"—

and transmitted a copy thereof by mail to plaintiff.

On the same day, it amended Section 8 of its By-laws to read as follows:

"Section 8. The officers of this Company shall not be authorized to deal in grain futures except for the purpose of protecting long holdings of wheat or short sales of flour, and then only on the authority of the board of directors."

Plaintiff had no notice or knowledge of such amended by-law.

In May, 1922, defendant authorized McNair, as its president, to employ plaintiff as broker to purchase and sell wheat and corn for future delivery for defendant in the name of McNair, and advised plaintiff of such authorization. Defendant's credit balance with plaintiff was thereupon transferred to the name of McNair on plaintiff's books, and subsequent purchases and sales of grain for future delivery were made in behalf of defendant in the name of McNair, and the account was carried on the books of both plaintiff and defendant in the name of McNair.

The account was settled May 18, 1924. In July, 1924, McNair, in behalf of defendant, again began to buy and sell wheat and corn for future delivery through the plaintiff as broker, and continued to do so until April 7, 1925. During this latter period, both plaintiff and defendant continued to carry such account on their books in the name of McNair. Defendant had knowledge that McNair was conducting such trading in his own name and made no objection thereto. It relied upon him for reports of the purchases and sales of wheat for future delivery made by him on its behalf on the Kansas City and Chicago Boards of Trade. Plaintiff forwarded confirmations of such transactions to McNair and the latter delivered such confirmations to defendant up to January 1, 1925. Plaintiff's and defendant's books were in agreement on December 31, 1924. After January 1, 1925, McNair did not deliver such confirmations to defendant, but plaintiff had no notice or knowledge of such omission.

The records of defendant showed that on December 31, 1924, plaintiff had 85,000 bushels of wheat purchased on the Kansas City Board of Trade for future delivery; and that on February 7, 1925, it sold 30,000 bushels of such wheat.

Defendant owned and operated a 500 barrel flour mill with a daily capacity of 2,300 bushels of wheat at Lyons, Kansas. During the years 1924 and 1925, such mill operated approximately one-half of the time. During that period defendant also dealt in corn.

While the purchases and sales of wheat for future delivery, made by plaintiff for defendant at the direction of McNair, aggregated more than a million bushels, the net amount purchased, after deducting the amount sold, never exceeded 155,000 bushels, which was approximately a sixty day supply for defendant's mill.

On July 21, 1923, defendant, through its treasurer, W. H. Boyce, addressed a letter to plaintiff, reading as follows:

"We shall be glad to have a statement of our account with you in the name of M. B. McNair."

Defendant drew drafts against plaintiff for prospective profits on its account with plaintiff in the name of McNair, as follows:

| | |
|---|---|
| August 30, 1924 | $ 5,000 |
| October 6, 1924 | 10,000 |
| December 26, 1924 | 10,000 |
| January 21, 1925 | 10,000 |
| February 6, 1925 | 5,000 |
| February 9, 1925 | 5,000 |

These drafts were paid by plaintiff and the proceeds received by defendant.

On March 14, 1925, plaintiff drew a draft on McNair at Lyons, Kansas, for additional margins in the sum of $20,000. This draft was paid by defendant.

On the foregoing facts, the court denied defendant relief on its counter-claim and gave judgment for plaintiff in the sum of $29,-967.49. From this judgment, defendant has appealed.

Counsel for defendant contend that the court erred in overruling their motion to dismiss. They assert that in order to maintain a bill in equity for an accounting, it must appear from specific allegations that there is a fiduciary relation between the parties or that the suit involves mutual accounts or that the account is so complicated that the remedy at law is inadequate.

■ The fact that plaintiff has an adequate remedy at law is no longer grounds for dismissing a bill in equity. Such objection must now be taken by motion to transfer the cause to the law side under Equity Rule 22 (28 USCA § 723) and section 274a of the Judicial Code (28 USCA § 397); Pierce v. National Bank of Commerce (C. C. A. 8) 268 F. 487; Brown v. Kossove (C. C. A. 8) 255 F. 806; Louisiana Agr. Corp. v. Pelican Oil Ref. Co. (C. C. A. 5) 256 F. 822; Twist v. Prairie Oil & Gas Co., 274 U. S. 684, 689, 47 S. Ct. 755, 71 L. Ed. 1297.

■■ Where the district court has jurisdiction of the subject-matter and the parties are before it, the objection that plaintiff has an adequate remedy at law may be waived by defendant. Chicago Bonding & Surety Co. v. United States (C. C. A. 7) 261 F. 266; Fay v. Hill (C. C. A. 8) 249 F. 415; Alliance Ins. Co. v. Alper-Salvage Co. (C. C. A. 6) 19 F.(2d) 828, 830; Miller v. Union Assur. Soc., Ltd. (C. C. A. 8) 39 F.(2d) 25, 28; Twist v. Prairie Oil & Gas Co., supra. The defendant, by failing to move to transfer the cause to the law docket and by requesting the court to try the cause sitting as a chancellor, waived the objection, if any there was, that plaintiff had an adequate remedy at law. Therefore, it is not necessary to determine whether the account sought in the instant case was of a character that would give a court of equity jurisdiction.

■ Counsel for defendant further contend that McNair exceeded his authority and that plaintiff was charged with notice thereof. Defendant recognized the agency of McNair by accepting the benefits of trades made by McNair to the extent of $45,000, by paying the draft for margins on May 14, 1925, and by referring to its account carried "in the name of McNair" in its correspondence with plaintiff. Defendant clothed McNair with apparent general authority to buy and sell wheat for future delivery for it in his own name. Secret instructions or limitations on the general authority of an agent are not binding upon a third person who deals with such agent in good faith without knowledge of such instructions or limitations, and in reliance upon the apparent authority with which the principal has clothed him. Southern L. Insurance Co. v. McCain, 96 U. S. 84, 26 L. Ed. 653; Aetna Ind. Co. v. Ladd (C. C. A. 9) 135 F. 636, 647; 2 C. J. p. 566, § 209. 155,000 bushels of wheat was not an excessive hedge for a flour mill of 500 barrel capacity and there was nothing about the transactions which would have warned plaintiff that McNair was exceeding his authority.

Counsel for defendant further contend that practically all of the orders for purchases or sales of wheat, given by McNair to plaintiff, were to be executed by plaintiff on the Board of Trade at Kansas City; that their legality is governed by the laws of Missouri; and that they were gambling transactions and illegal and void under the provisions of sections 3564 to 3574, inclusive, Revised Statutes of Missouri, 1919.

■ The validity of the contracts is governed by the applicable law of the place where the orders for purchase or sale were executed. Mullinix v. Hubbard (C. C. A. 8) 6 F.(2d) 109, 114; Hoyt v. Wickham (C. C. A. 8) 25 F.(2d) 777, 779; 27 C. J. p. 1050.

Sections 3 and 4 of the Grain Futures Act (sections 5 and 6, title 7, USCA) reads as follows:

"Resolution declaring dangerous tendency of dealings in grain futures. Transactions in grain involving the sale thereof for future delivery as commonly conducted on boards of trade and known as 'futures' are affected with a national public interest; that such transactions are carried on in large volume by the public generally and by persons engaged in the business of buying and selling grain and the products and by-products thereof in interstate commerce; that the prices involved in such transactions are generally quoted and disseminated throughout the United States and in foreign countries as a basis for determining the prices to the producer and the consumer of grain and the products and by-products thereof and to facilitate the movements thereof in interstate commerce; that such transactions are utilized by shippers, dealers, millers, and others engaged in handling grain and the products and by-products thereof in interstate commerce as a means of hedging themselves against possible loss through fluctuations in price; that the transactions and prices of grain on such boards of trade are susceptible to speculation, manipulation, and control, and sudden or unreasonable fluctuations in the prices thereof frequently occur as a result of such speculation, manipulation, or control, which are detrimental to the producer or the consumer and the persons handling grain and products and by-products thereof in interstate commerce, and that such fluctuations in prices are an obstruction to and a burden upon interstate commerce in grain and the products and by-products thereof and render regulation im-

246

perative for the protection of such commerce and the national public interest therein."

"Prohibition against dealings in grain futures; general exceptions. It shall be unlawful for any person to deliver for transmission through the mails or in interstate commerce by telegraph, telephone, wireless, or other means of communication any offer to make or execute, or any confirmation of the execution of, or any quotation or report of the price of, any contract of sale of grain for future delivery on or subject to the rules of any board of trade in the United States, or for any person to make or execute such contract of sale, which is or may be used for (a) hedging any transaction in interstate commerce in grain or the products or by-products thereof, or (b) determining the price basis of any such transaction in interstate commerce, or (c) delivering grain sold, shipped, or received in interstate commerce for the fulfillment thereof, except— * * *

"(b) Where such contract is made by or through a member of a board of trade which has been designated by the Secretary of Agriculture as a 'contract market,' as hereinafter provided in this chapter, and if such contract is evidenced by a record in writing which shows the date, the parties to such contract and their addresses, the property covered and its price, and the terms of delivery: Provided, That each board member shall keep such record for a period of three years from the date thereof, or for a longer period if the Secretary of Agriculture shall so direct, which record shall at all times be open to the inspection of any representative of the United States Department of Agriculture or the United States Department of Justice."

The Missouri statute clearly has no application to purchases or sales of grain for future delivery made at a duly designated contract market in accordance with the provisions of the Grain Futures Act and the rules prescribed by such market. State ex rel. Burnett v. Rosenbaum Grain Co., 115 Kan. 40, 222 P. 80; State v. Christopher, 318 Mo. 225, 2 S.W.(2d) 621, 630.

In the latter case, the court, in speaking of the Grain Futures Act, said:

"We think the purpose of Congress and the effect of the act was not to destroy the police power of the state in such matters, nor to annul the Missouri statute, but to restrict its operations. We accordingly hold, until federal authority declares otherwise, that the effect of the Grain Futures Act was to re-

strict the operation of state laws, like our section 3574, so as to make them inapplicable to transactions coming within the terms of the Grain Futures Act, conducted on a 'contract market' according to the rules prescribed by that market."

We are not here called upon to determine whether the Grain Futures Act has superseded the Missouri Statute to a greater extent than the Missouri court concludes.

The courts of the United States will take judicial notice of rules and orders made by the executive departments of the national government. Southern Pacific R. R. Co. v. Groeck (C. C. Cal.) 68 F. 609, 612; Caha v. United States, 152 U. S. 211, 221, 222, 14 S. Ct. 513, 38 L. Ed. 415. It was therefore unnecessary to prove that the Kansas City Board of Trade had been duly designated as a contract market by the Secretary of Agriculture.

The burden of proving that a transaction is a wager rests upon the party alleging it. Clews v. Jamieson, 182 U. S. 461, 490, 491, 21 S. Ct. 845, 45 L. Ed. 1183; Cleage v. Laidley (C. C. A. 8) 149 F. 346, 352; Browne v. Thorn (C. C. A. 8) 272 F. 950, 952; Hoyt v. Wickham (C. C. A.) 25 F.(2d) 777, 780.

A contract for the sale of grain to be delivered at a future date is valid, even though the seller has not the grain and can only get it by going into the market and buying it before the date of delivery, provided that, at the time of making the contract, the parties really intend the grain shall be delivered by the seller and that the purchase price shall be paid by the buyer. On the other hand, if, under the guise of such a contract, both parties intend that there shall be no delivery of the commodity but intend instead that, on the date fixed for executing the contract, there shall be a mere payment by one party to the other of the difference between the market price and the contract price, the transaction is a wager and is illegal. Clewes v. Jamieson, 182 U. S. 461, 489, 21 S. Ct. 845, 45 L. Ed. 1183; Board of Trade of City of Chicago v. Christie Grain & S. Co., 198 U. S. 236, 25 S. Ct. 637, 639, 49 L. Ed. 1031; Irwin v. Williar, 110 U. S. 499, 508, 4 S. Ct. 160, 28 L. Ed. 225; Cleage v. Laidley, supra; Gettys v. Newberger (C. C. A. 8) 272 F. 209, 216, 219. The intent which exists at the time of entering into the contract governs the validity of the transaction. Gettys v. Newberger, supra; Clarke v. Foss, 5 Fed. Cas. 955, No. 2852; 27 C. J. p. 1063, § 275.

■ Such illegality will not render unenforceable the broker's account for advances incurred or commissions earned in connection with the negotiation of such a contract, unless he had knowledge of such intention upon the part of the parties to the contract. Gettys v. Newberger (C. C. A. 8) 272 F. 209, 217; Irwin v. Williar, 110 U. S. 499, 509, 510, 4 S. Ct. 160, 166, 28 L. Ed. 225; Rountree v. Smith, 108 U. S. 269, 2 S. Ct. 630, 27 L. Ed. 722; Embrey v. Jemison, 131 U. S. 336, 345, 9 S. Ct. 776, 33 L. Ed. 172.

In Irwin v. Williar, supra, the court said:

"It is certainly true that a broker might negotiate such a contract without being privy to the illegal intent of the principal parties to it, which renders it void, and in such a case, being innocent of any violation of law, and not suing to enforce an unlawful contract, has a meritorious ground for the recovery of compensation for services and advances."

■ Hedging is defined in Board of Trade of City of Chicago v. Christie Grain & S. Co., supra, as

"A means by which collectors and exporters of grain or other products, and manufacturers who make contracts in advance for the sale of their goods, secure themselves against the fluctuations of the market by counter contracts for the purchase or sale, as the case may be, of an equal quantity of the product, or of the material of manufacture."

■ A set-off is a method by which a contract to purchase is set off against a contract to sell without the formality of an exchange of warehouse receipts or other actual delivery and, in legal effect, is a delivery. Speaking of set-offs on the Chicago Board of Trade, the court, in Board of Trade of City of Chicago v. Christie Grain & S. Co., 198 U. S. 236, at page 248, 25 S. Ct. 637, 638, 49 L. Ed. 1031, said:

"We must suppose that from the beginning, as now, if a member had a contract with another member to buy a certain amount of wheat at a certain time, and another to sell the same amount at the same time, it would be deemed unnecessary to exchange warehouse receipts. We must suppose that then as now, a settlement would be made by the payment of differences, after the analogy of a clearing house. This naturally would take place no less that the contracts were made in good faith, for actual delivery, since the result of actual delivery would be to leave the parties just where they were before. Set-off has all the effects of delivery."

■ Ringing up, ringing off or ringing out is a method by which a group of dealers on a board of trade discharge contracts for future delivery before delivery is due by a system of off-sets, cancellations and adjustment of differences in lieu of actual delivery of the commodity sold. Williar v. Irwin, 30 Fed. Cas. 38, No. 17761; Ward v. Vosburgh (C. C.) 31 F. 12, 16; 27 C. J. p. 994, § 120. It is simply a more complex case of set-off. Board of Trade of City of Chicago v. Christie Grain & S. Co., supra, page 248 of 198 U. S., 25 S. Ct. 637, 49 L. Ed. 1031.

■ The fact that contracts for future delivery are closed out before delivery is due, by set-off or ringing off in accordance with the rules and regulations of the Board of Trade and its clearing house, and the fact that a purchaser so intended to close out a contract before delivery was due, does not make the contract a wager and invalid. Board of Trade of City of Chicago v. Christie Grain & S. Co., 198 U. S. 236, 248, 249, 25 S. Ct. 637, 49 L. Ed. 1031; Cleage v. Laidley (C. C. A.) 149 F. 346, 351, 352; Gettys v. Newberger (C. C. A. 8) 272 F. 209, 219; Mullinix v. Hubbard (C. C. A. 8) 6 F.(2d) 109.

In Gettys v. Newberger, supra, the court said:

"The vice which renders contracts of purchase or sale of cotton, grain, or other personal property to be delivered in the future, which are valid on their faces, wagering contracts and illegal, is the intention of both parties, when they are made, that they shall be settled and the obligations under them discharged by the payment of the differences between the contract and the market prices of the property at the respective times fixed in the contracts for their delivery. There are lawful methods, to wit: By set-off and ringing off, and the payment of the differences, of closing out such contracts and discharging the liabilities of the parties thereunder before the times for deliveries of the property fixed therein arrive, so that no liability to deliver or receive or pay will exist at the fixed times for delivery. Where such contracts are closed out before such times of delivery, the legal presumption is, in the absence of substantial evidence to the contrary, that at the time the parties made the contracts they intended to close them out by these legal methods, and not by the illegal method of paying the difference between the contract prices and the market prices at the times of delivery, so that there would be no liability to deliver and no delivery of the property at such times for

deliveries, and this intention is a lawful intention which does not detract from the good faith of the parties or the validity of the contracts."

Hedging is lawful. It is recognized as a legitimate and useful method of insuring against loss on a contract for future delivery. A purchase or sale made as a hedge is none the less "a serious business contract for a legitimate and useful purpose that it may be offset before the time of delivery in case delivery should not be needed or desired." Board of Trade of City of Chicago v. Christie Grain & S. Co., supra, page 249 of 198 U. S., 25 S. Ct. 637, 639.

The evidence wholly failed to show that the transactions in question were not legitimate hedging contracts entered into in accordance with the Grain Futures Act with the intention, at the times of their making, that they would be performed by actual delivery of the wheat at the times fixed for delivery or of closing them out by set-off or ringing off in accordance with the rules and regulations of the Kansas City and Chicago Boards of Trade before the times for delivery. Therefore, defendant failed to establish that the contracts were illegal.

Counsel for defendant further contend that plaintiff violated the rule of the Kansas City Board of Trade, above set out. This rule was for the benefit of defendant and other corporations similarly situated. Instead of taking advantage of the rule, defendant elected to carry on its trading in the individual name of its president rather than its own name. Under these circumstances, it cannot invoke a violation of the rule on the part of plaintiff in order to escape liability for losses, especially after having accepted the profits on other contracts made by McNair. Furthermore, the rule carries its own penalty and does not declare that contracts made in violation thereof shall be invalid.

During the trial, defendant offered in evidence a statement of Hitzman, a former agent of plaintiff. The court excluded this statement and the ruling is assigned as error. The statement, having been made at a time when the agency of Hitzman had ceased, clearly was not admissible against plaintiff. Walker Mfg. Co. v. Knox (C. C. A.) 136 F. 334, 342, 343; 22 C. J. p. 381.

We conclude that the decree was right and it is therefore affirmed.